UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

HENRI KELI

31 Park Grange Mount

South Yorkshire

Sheffield S2-3SP

United Kingdom

+44 7713165831


Plaintiff


V.


CONDOLEEZA RICE, as Secretary of State

U.S. Department of state, 2201 C street NW, Washington DC20520


MAURA HARTY, as Assistant Secretary, Bureau of consular Affairs

U.S. Department of state, 2201 C street NW, Washington DC20520


STEPHEN A. "TONY" EDSON, as Deputy Assistant Secretary of State for Visa Services

U.S. Department of state, 2201 C street NW, Washington DC20520


Defendants,

Civil Action No: 07-1697 (RBW)

Assigned To: Walton, Reggie B.

Assigned. Date: 09/20/2007

Description: Pro Se General Civil

RECEIVED

DEC 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' AMENDED
COMPLAINT**

**PRELIMINARY STATEMENT**

Plaintiffs submit this memorandum of law in opposition to the government's motion to Dismiss. In this case, the Plaintiffs challenge the systematic failure to follow applicable law and regulations that occurred in the chaotic administration of the 2007 Diversity Visa Lottery ("DV 2007") by the US Embassy of London and the Department of State ("DOS").

Plaintiffs were among the approximately 82,000 aliens randomly selected to receive 55,000 [1] visas under DV 2007 **within these 82000 Plaintiff was the sole and only winner from the French Southern Antarctic Lands (exhibit A."** Diversity Visa Lottery 2007 (DV-2007) Results **"p.2).** In all cases, the systematic failure of the Defendants to timely process the Plaintiff's application for Legal Permanent Residency in a timely and complete manner, including processing his background checks, caused the Plaintiff to lose their eligibility for Legal Permanent Residency under the diversity visa program and shatter a life time's dream. The detailed allegations in this case certainly make out a pattern that clearly permits the inference of misrepresentation and affirmative misconduct in the handling of Plaintiff's application, as well as demonstrating repeated violations of applicable law.

---------------------------------------------------------------------------------

1. Of the 55,000 DV visas available, Congress allocated 5,000 visas for use pursuant to the Nicaraguan and Central American Relief Act, Pub. L. No. 105-100, 110 Stat, 2160 (1997)

Defendants contend that this Court lacks jurisdiction to provide such relief. To the contrary, courts have found that the Defendants have a mandatory duty to adjudicate applications for a diversity visa , and have found that his duty continues even after the diversity visa program ended for the fiscal year in question. Since this action was filed prior to the end of the fiscal year 2007, the Court retains jurisdiction to grant relief.

Furthermore, under the familiar standards government response by submitting to Federal Courts all over the country motions to dismiss, this case should simply not be terminated at the pleading stage, especially when there has been no discovery, nor even production of plaintiffs' immigration files. *See, e.g.,* Dangler v. New York City Off Track Betting Corporation, 193 F.3d 1130 (2d Cir. 1999).

As for the government's argument on subject matter jurisdiction, this runs directly counter to Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 47 (1999), which holds that the jurisdictional limitations in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, Title III-A, 110 Stat. 3009 ("IIRIRA") must be narrowly construed. Similarly, the Government's entire argument on exhaustion fails to acknowledge Darby v. Cisneros, 509 U.S. 137 (1993), which holds that exhaustion should not be required when not mandated by statute .

Moreover, Plaintiff has not and does not request for the review of a consular's decision since one point of this lawsuit is to force the government to adjudicate on a visa application unlawfully delayed, instead the US Department of State (DOS) response was just to put the case on hold into the 30th September 2007 and reply to the complaint by using the argument:

- No more visa are available (without factual discovery initiated or supporting evidences)
- No visa can be issued after the end of the fiscal year (in contrary to several court of Justice 's decisions)

In short this Court has subject matter jurisdiction over Plaintiffs' claims of widespread and unlawful government action in the allocation of statutory benefits, especially in light of such cases as McNary v. Haitian Refugee Center, 498 U.S. 479 (1991).

Moreover, this Court has the equitable power to provide a remedy for the DOS' violation of the law, while that violation should not be immune from judicial review because any final remedy is assertedly limited.

Instead, as Justice Brandeis wisely observed in language directly applicable here, "The supremacy of law demands that there shall be opportunity to have some court decide whether an erroneous rule of law was applied; and whether the proceeding in which facts

were adjudicated was conducted regularly." *See,* St. Joseph Stockyards Co. v. United

States, 298 U.S. 38 (1936) (Brandeis, J., concurring).

Finally, relief is appropriate in this instance as The DOS claim the Court and the

Plaintiffs should rely upon statements regarding the expiration of visas on September 30,

2007, which is misleading at best because of the facts :The Department of State has

shown years after years its inability to process in a timely manner Diversity Visa

applications resulting on average to approximately 10 % of Diversity Visa not being used

(Yearbook of immigration Exhibit "F"). As such, the Court has the ability in this situation

to correct such action and award the Plaintiff visas under the equitable powers of the

Court.

## STATEMENT OF THE CASE

The basic facts and allegations in this case centre on the DOS' administration of DV

2007 lottery. On this motion to dismiss, the Plaintiff's allegations must be accepted as

true and all reasonable inferences from those allegations must be drawn in Plaintiffs'

favour. *See, e.g.,* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Scheuer v. Rhodes,

416 U.S. 232 (1974); Connell v. Signoracci, 153 F.3d 74, 80 (2d Cir. 1998) ("We accept

as true the factual allegations of the complaint and we read it liberally drawing all

reasonable inferences in favour of the plaintiff").

In essence, those facts and allegations establish that Plaintiffs won the DV 2007 lottery,

were clearly eligible to gain Permanent Residency in the United States, presented no

factors that would have justified denial of their applications (exhibit B " FBI Finger print report and CIA FOIA request), and promptly applied for Legal Permanent Residency when visas became available under the DV program at the beginning of the 2007 fiscal year on October 1, 2006.

Nevertheless, the DOS failed to process these applications in a timely manner, failed to request that the FBI and the CIA expedite necessary clearances (Exhibit C "criteria to expedite FBI name Check"), and failed to complete adjudication of Plaintiff's application for a diversity visa  while visas remained current, and in any event, failed to adjudicate the applications by September 30, 2007. Additionally, the FBI and the CIA failed to act on Plaintiff's background clearances in a timely manner, and in doing so caused the Plaintiff' s irreparable harm.

Finally, the DOS2 is close to misleading the Court in stating  all visas for DV 2007 were used, and since the Plaintiff2 case was approvable before September 30, 2007, this Court should grant equitable relief.

---

2 However, based on past year trends visas are in fact available (*See,* Yearbook of Immigration Statistics, Which indicates that only 44,471 visas were used for 2006; As such, the Defendants should be equitably estopped from claiming that the Court lacks jurisdiction to issue visas because the program for DV 2007 has ended And there are no longer any visas.

**A. The Allocation of Immigrant Visas and the Creation of Diversity Visa Lottery**

In general, the Immigration & Nationality Act of 1952, as amended (the "Act") allocates Immigrant visas based upon preferences grounded in family relationships or employment needs.

Each family and employment preference category has a numerical quota and preference petitions are filed to establish a priority date for visa issuance when the priority date is reached on the quota for the preference category involved. *See*, 8 U.S.C. §1153; 1 C. Gordon, S. Mailman, S. Yale-Loehr, Immigration Law and Procedure §31.02.[3] With Section 131 of the Immigration Act of 1990 ("1990 Act"), Pub. L. No. 101-649, 104 Stat. 4978, 4987-94, however, Congress, responding to concerns about the need to "enhance and promote diversity" among immigrants to the United States, enacted a permanent program to allocate some 55,000 immigrant visas each year for "natives of regions of the world where immigration through the preference system has been lower than 50,000 over the previous five years." H. Rep. No. 101-723 (I) ("House Report") at 48, reprinted in [1990] U.S. Code Cong. & Admin. News 6710, 6728. *See also*, 1 C. Gordon, S. Mailman & S. Yale-Loehr, Immigration Law and Procedure §40.45 (1999), which discusses the origin and evolution of a permanent diversity lottery program.[4] Under 8 U.S.C. § 1153(c), the Attorney General allocates the 50,000 visas by region each fiscal year according to a statutory formula, with the inhabitants of those regions eligible to compete for a visa in a purely random lottery. 1 C. Gordon, S. Mailman & S. Yale-Loehr, Immigration Law and Procedure §§ 39B.04 [5].

## B. Procedures For the 2007 Diversity Visa Lottery

In accordance with the procedures established by the 1990 Act, the Attorney General made regional allocations for the 50,000 visas and final regulations for participation in the lottery were published by the DOS. Lottery entries were to be electronically submitted to a website address designated by the DOS within the period set for the lottery 22 C.F.R. § 42.33 (b). Upon receipt, this application was then to be sorted and grouped by region. Within each region, petitions were to be given a rank number randomly assigned by computer. 22 C.F.R. §42.33(b).

---

3 The evolution of American immigration law from the national origin quota system enacted in 1924 to a worldwide annual quota is traced in 2 C. Gordon, S. Mailman, & S. Yale-Loehr, Immigration Law & Procedure, §31.01 [1] at 31-2--31-3.

4 As the columnist Ben Wattenberg observed, perhaps typifying the public debate on the Lottery, his parents' best chance to immigrate to the United States under current law "would Have been to win in an international lottery to qualify as so-called 'diversity' immigrants." New York Post, June 1, 1996, at 19.

Following the assignment of rank order, the DOS was then required to select in the rank orders determined by the computer program, a quantity of applications for each region estimated to be sufficient **to ensure, to the extent possible, usage of all immigrant visas authorized under 8 U.S.C. §1153(c) for that fiscal year**. The lottery applications, denominated as "petitions," were then to be processed and approved by **the Kentucky consular center (First security screening process)** if they were legible and contained the information required to be submitted for entering the lottery. 22 C.F.R. § 42.33 (d).[5]

Furthermore, winners were encouraged by the government to act quickly on applying for an immigrant visa. 62 Fed. Reg. at 39811 ("Those selected will . . . need to complete and file their immigrant visa applications *quickly*.").

Here, the Plaintiff did just that, promptly submitting, as alleged, everything required to qualify him for. *See*, Paunescu v. DOS, 1999 U.S. Dist. Lexis 3499 at 5n3 (N.D. Ill. 1999) ("Paunescu I") (in addressing the same claim by the government, the Court notes "In the instant case, however, it is alleged that Plaintiff provided everything required in a timely manner, making them eligible to receive one of the available numbers.").[6]

-------------------------------------------------------------------------------------------

5 Each lottery entry was required to give the names as well as the date and place of birth of the Applicant and the applicant's spouse and children along with the applicant's mailing address And native country if different from country of birth. 22 C.F.R. §42.33(b).

6 While the government also makes much of the time limit on the DV 2007 program, Gov. Mem. at 8, this emphasis, as discussed below, simply obscures the legal issue of whether Plaintiff was unlawfully denied the benefits of this program when the program existed. *See* Paunescu I & II. Moreover, despite the government's claim, the notice to DV winners Submitted by the government says nothing about visa eligibility not carrying over nor does Such language appear in the current version of 22 C.F.R. §42.33(e).

**C. Administration of the 2007 Diversity Visa Lottery
And the Plaintiff s' Application for a visa**

From 12:00 AM on October 5, 2005, until midnight, December 4, 2005, the DOS

received the DV Lottery entries, and in or about July 2006, notified the winners of their

selection.

Recognizing that many diversity lottery winners were outside of the United States and

could apply for Legal Permanent Residency ,[7] the DOS directed that all consular office

undertake prompt handling of DV applications, so that they could be scheduled and

completed as soon as possible.

Furthermore, the directive required special procedures to expedite and follow-up on

security clearance matter for cases risking ageing out such as DV cases (Exhibit " D " 9

FAM Appendix G, 400 and 500) (exhibit "C" INS instructions to expedite cases).

Moreover, as a standard procedure on the day of the first interview for the immigrant

Visa at the US Embassy of London (January 10th 2007) a full set of finger prints plus

digital pictures were taken in addition to name checks done with Washington Agencies.

The Plaintiff was notified that he had won the lottery and, following the government's

instructions, acted quickly to file his application with the DOS shortly after

--------------------------------------------------------------------------------

7 As with alien beneficiaries of an approved visa petition based on a family or employment preference, winners of the
diversity lottery could obtain lawful permanent residence either through issuance of an immigrant visa by an American
consulate, or by application for Legal Permanent Residency to lawful permanent resident in the United States. *See* 8
U.S.C. §§1201--1202, 1255. Moreover, the availability of had been expanded by Congress with the amendment to 8
U.S.C. §1255 (i), effective October 1, 1994 expressly making available to all aliens who had overstayed their periods of
authorized admission or even entered without inspection, provided the alien applicant paid not only the regular
application fee, but an additional surcharge of $1,000. *See*, Pub. L. 103-317, 108 Stat. 1765; 8 C.F.R. §103.7(b)(1).

commencement of the 2007 fiscal year, submitting all that was necessary to establish his

eligibility for. While the government seeks to characterize Legal Permanent Residency

under Section 245 of the Act, 8 U.S.C. §1255, as something of an extraordinary remedy,

the practical reality is quite different as one respected authority has noted. *See*, 4 C.

Gordon, S. Mailman, S. Yale-Loehr, Immigration Law and Procedure §51.05(1) ("the

numbers reflect that  has become a routine vehicle to residence."). Indeed, both the

Supreme Court and the Board of Immigration Appeals have expressly recognized that

most applications are routinely granted while here the Plaintiff clearly established their

eligibility. *See*, ElkDOS v. Moreno, 435 U.S.

647, 667 (1978); Matter of Arai, 13 I & N 444 (1970).


When Plaintiff's application was filed, DV visas were clearly available and had

not been exhausted. As the government correctly notes, both the statute and applicable

regulations required a visa to be "immediately available" when an application is filed.

*See*, 8 U.S.C. §1255(a); 8 C.F.R. §245.1(g)(1).


The DOS frustrated Congress' intent by failing to take any further action in these cases,

they did not follow-up with the FBI or the CIA, and simply waited until after September

30, 2007, and improperly ignored this case due to lack of visas. Had the DOS complied

with the operating instructions in effect (Exhibit "D"), instead of complying with a rogue

internal policy, the Plaintiff's application would have been approvable at the time of his

interview or before the end of the fiscal year in question , and a visa would have been

requested from the DOS, and issued, since visas were still available. This policy is

inconsistent with other agencies and with their own policies,[8] therefore, putting the

Plaintiff in this action on unequal footing with other applicants around the World, and

raising serious due process and equal protection concerns.

---

8 In a diversity visa action filed , Tomaszewski v, Ashcroft, CV-04-4030, the Honorable Raymond Dearie,
United States District Judge, signed an Order to Show Cause ordering the Department of State to reserve visa numbers
for the Plaintiffs in that action pending final adjudication of their cases.
Thereafter, the Defendants entered into a Stipulation of Settlement in which they agreed to reserve visas for the
Plaintiffs in that action and that they will continue to reserve those visas and make them available after September 30,
2004. . Defendants conceded and reserved visas numbers for the **Plaintiffs and have agreed to make them available
after September 30, 2004. As such, the Defendants should be estopped from claiming that visa numbers cannot
be used after the fiscal year has ended.**

**ARGUMENT POINT I**
**THIS COURT HAS SUBJECT MATTER JURISDICTION**

In this case, subject matter jurisdiction clearly exists under 28 U.S.C. §1331 for the claims asserted by the plaintiff under federal law. *See e.g.*, Rahim v. Mc Nary, 24 F.3d 440, 442 (2d Cir. 1994); Perales v. Thornburgh, 967 F. 2d 798, 805 (2d Cir. 1992), *vacated and remanded on other grounds sub. nom.* Reno v. Perales, 509 U.S. 917 (1993). Indeed, with respect to subject matter jurisdiction, this case presents a familiar instance of non-statutory review of asserted illegal agency action under the Administrative Procedure Act, 5 U.S.C. §701 *et seq*, with subject matter jurisdiction provided, at a minimum, by 28 U.S.C. §1331. *See, e.g.*, Califano v. Sanders, 430 U.S. 99 (1977); Kim v. Ashcroft, 2004 WL 1687201 (S.D.N.Y. July 27, 2004); Burger v. McElroy, 1999 U.S. Dist. Lexis 4854 (S.D.N.Y. 1999) (subject matter jurisdiction exists under 28 U.S.C. §1331 to review claimed legal errors in denial of application); Mart v. Beebe, 94 F.Supp. 2d 1120 (D. Ore. 2000) ("Mart I") (denying government's motion to dismiss for lack of subject matter jurisdiction in case where plaintiff challenged denial of under DV lottery program based on erroneous INS determination of ineligibility); Paunescu v. DOS, 1999 U.S. Dist. Lexis 34999 (N.D. Ill. 1999) ("Paunescu I")(denying motion to dismiss in DV case); Marcetic v. DOS, 1998 U.S. Dist. Lexis 1252 (N.D. Ill. 1998) (same).

Moreover, the existence of subject matter jurisdiction finds further support in "the strong presumption that Congress intends judicial review of administrative action." Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 670 (1986). Defendants will undoubtedly contend that this Court lacks jurisdiction to provide such relief.

To the contrary, courts have found that the Defendants have a mandatory duty to
adjudicate applications for Legal Permanent Residency. *See e.g.*. Iddir v. INS, 301 F.3d
492, 500 (7th Cir. 2006) (the relevant statutes and regulations confirm that the INS did
have the duty to adjudicate the appellants' applications in a reasonable period of time.");
Paunescu v. INS, 76 F. Supp. 2d 896 (N.D. Ill. 1999) (Mandamus used to compel
adjudication and grant of visa in diversity even after fiscal year ended); Marcetic v, INS,
1998 WL 173129 (N.D. Ill. April 6, 1998)(INS ordered to complete all remaining process
of a plaintiff's Legal Permanent Residency),9 Agbemaple v. INS, 1998 WL 292441,*2
(N.D. Ill. 1998)( plaintiff is entitled to a decision within a reasonable time, and that it is
within the power of the court to order such an adjudication); *see also*, Mastrapasqua v.
Shaughnessy, 180 F.2d 999, 1002 (2d Cir, 1950) ("[I]n appropriate circumstances,
[courts] can compel correction of an abuse of discretion or can compel an official to
exercise his discretion where he has obviously failed or refused to do so.").

---

9 In fact, in Marcetic the Government argued that the plaintiff had a clear right to the allocation
of a visa number prior to the September 30th cut-off, but did not have a clear right after the
September 30th cut-off. Id. at *1.

**A. The Court Has APA (Administrative Procedure Act) Jurisdiction**

As noted above, the federal question status confers jurisdiction on the district courts over actions "arising under" federal law. Specifically, §1331 provides that '[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. §1331. This has been interpreted to mean that federal question jurisdiction exists where: "(1) the claim turns on an interpretation of the law or Constitution of the United Sates and (2) the claims is not 'patently without merit.'" Bell v. Hood, 327 U.S. 678, 683–85 (1946).

The APA "itself does not confer jurisdiction on a district court to review the decision of an administrative agency, but plaintiffs are given the right to sue the government in a federal court by the [APA] but the subject matter jurisdiction basis is the federal question statute. 14A Charles Alan Wright, Arthur C. Miller & Edward H. Cooper, Federal Practice and Procedure § 3659, at 51 (3d ed. 1998).

As such, where a plaintiff alleges that the defendant violated the APA, a court may exercise subject matter jurisdiction pursuant to §1331. The key provision is section 6 of the APA, which states, in relevant part, that "[with due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. §555(b). Here, where Plaintiffs allege that the delay in adjudicating Plaintiff's application was unreasonable, subject matter jurisdiction exists. See, Kim, 2004 WL 1687201 at *4.

**B. The Court Has Mandamus Jurisdiction**

Mandamus jurisdiction is invoked under 28 U.S.C. §1361 to compel and officer or employee of the DOS or another government agency to perform a nondiscretionary duty owed to a party. To be entitled to mandamus a party must establish: (1) a clear and certain claim; (2) that the duty owed is ministerial and so plainly prescribed as to be free from doubt; and (3) that no other adequate remedy is available. This case is exactly the type of case for which mandamus is appropriate, and the Courts have held as such. *See*, Nyaga v. Ashcroft, 186 F. Supp. 2d 1244 (N.D. Ga. 2006), *rev'd. on other grounds,* Nyaga v. Ashcroft, 323 F.3d 906 (11th Cir. 2007) (Mandamus action to compel adjudication of diversity visa petition as if fiscal year had not ended); Iddir v. INS, 166 F. Supp. 2d 1250, 1256-57 (N.D. Ill. 2001) (Finding mandamus to require adjudications of visa lottery application); Paunescu v. DOS, 76 F. Supp. 2d 896; Marcetic v, INS, 1998 WL 173129; Agbemaple v. INS, 1998 WL 292441.


In Paunescu, the District Court held that it had jurisdiction under the mandamus statute to Order DOS to adjudicate Plaintiffs' applications for Legal Permanent Residency before September 30th. Paunescu v. DOS, 76 F. Supp. 2d at 903. The facts in Paunescu are identical to the present case in that the Plaintiffs fully complied with all the requirements of the diversity visa program; they were interviewed on connection with their applications for Legal Permanent Residency, and were only waiting for their clearances from the FBI. The Court held that the Defendants "had a non-discretionary duty to issue a decision on plaintiff's application within a reasonable time." Id. at 901 (*citing* Yu v. Brown, 3 F. Supp.2d 922, 931 (D.N.M. 1999) ("All other courts addressing this question

have held that DOS has a non-discretionary duty to process applications for LPR status as

well as all other immigrations applications)(emphasis added)(citing cases); Id. at 932

(holding that the DOS "Owe[s] Plaintiffs non-discretionary duty to complete processing

of Plaintiff's [LPR] applications in a reasonable time."); *see also,* 2 Am.Jur.

Administrative Law 379 ("even though agency action may be subject to no explicit time

limit, a court may compel an agency to act within a reasonable time.").Id.

In Nyaga, the District Court ordered the INS to adjudicate the plaintiff's diversity visa

application as if the fiscal year had not ended due to the fact that the "sole reasons why

[the plaintiff's] application was not timely considered [was] the government's failure to

act or follow through on processing the application." Id. at 1255. The District Court

found that (1) the plaintiff "has a right for the visa application to be processed and a final

thorough decision made;" (2) the INS "has a non-discretionary duty to make diligent

efforts in furtherance of adjudicating diversity visa applications;" and (3) "the Plaintiffs

have no alternative remedy to mandamus." Id. at 1253–54.

Specifically, the Court concluded that "Congress could not have intended for aliens to

lose their eligibility to be considered for diversity visas due solely to government

inaction." Id. at 1256.10

Here, the Plaintiff is in the same position with a slight difference of filing this civil action

against the DOS before the end of fiscal year. Under 8 U.S.C. §1255, the USCIS may

adjust an alien's status to that of a lawful permanent resident if the alien applies for such

a visa and is eligible for a visa, and if a visa is available to him at the time his application is filed. Without doubt, §1255 provides a right to an adjudication within a reasonable time. Abgemaple v. DOS, 1998 WL 292441, at *2 ("A contrary position would permit the DOS to delay indefinitely."); Yu v. Brown, 3 F. Supp.2d at 931. Given that DOS has a nondiscretionary duty to process plaintiff s' application; it follows, that the applications must be processed by September 30, 2007. To do otherwise, would eviscerate the Plaintiff s' rights under the diversity visa program, and renders nugatory the entire diversity visa statute. Congress could not have intended the DOS to authorize such delays and deprive aliens of their right to adjust their status pursuant to the diversity visa program.

---

10 Though, the District Court's decision was appealed, vacated and remanded by the Ninth Circuit Court of Appeals, the Court ruled only that the action was moot as the diversity visa program had ended. Nyaga v. Ashcroft, 323 F.3d 906 (11th Cir. 2007).

The government makes much of the statutory security clearances requirement, while failing to two counts, First the Department of State and Related Agencies Appropriations Act of 1995, Pub. L. No. 103-317, Tit. V., §§ 505, 506(d), 108 Stat. 1725, 1766 (1994), requires security clearance to be initiated as early as possible and followed up for case risking ageing out. Id. at 506(d). In fact, other statutes and regulations require completion of background checks before the application or petition can be approved. *See,* Public Law 105-119 (HR 2267) November 26, 1997, which requires that the INS receive confirmation from the FBI that a full criminal background check has been completed before adjudicating a naturalization application.

Secondly The DOS is failing in his role as first line of defence as described by former Secretary of State Colin Powell, the delay in obtaining the security clearance at an early stage is a major security flaw. The DOS at this specific point of time is unable to identify a possible threat in the early stage but instead would leave cases on the shelf for days, months and years. In this particular case the DOS had three opportunities to initiate and complete the security clearance ( stage 1 clearance through Kentucky Consular centre , stage 2 first interview and finally stage 3 follow up interview )

In this case, the DOS failed to follow-up with the FBI and the CIA, and often failing to actually sending the appropriate requests at the appropriate time to the FBI and the CIA (First interview was on 10th January 2007)  until it was too late. The government makes much of the fact that they have no control over the FBI and the CIA and that neither the FBI nor the CIA had a duty to complete Plaintiffs' background clearances.

However, DOS has a specific unit which is responsible for the coordination with the FBI and the CIA regarding fingerprints and background clearances, a Field Coordination Unit which "coordinates and monitors the Fingerprint Liaison located in the FBI complex, Clarksburg, West Virginia. The Fingerprint Liaison provides direct support to all DOS fingerprint clearance operations, as well as to the FBI on DOS related matters. The unit serves as the primary liaison with the CIA, FBI and other external organizations related to service operations and customer service, and represents HQ with field offices." Id. As such, DOS is hard pressed to make the argument that they have no control over the processing (exhibit E "Testimony" from high Ranking official of the DOS).

Additionally, for special cases, there are special expedite procedures in place. *See*, OI 105.10(c) . This section provides, in part, that "[w]hen an expeditious response is needed from the FBI or CIA because of an unforeseen emergency or other circumstances indicting a sound basis for urgency.In these cases, these procedures were simply not followed. What could present more pressing concern than a program authorized by Congress to expire within a specific time period? Every attempt should have been made by the Defendants to process these cases in the proper and timely manner. In not doing so, they have frustrated Congress' attempt to allow individuals from **VERY** low admission countries (Exhibit "A" p.2) to win the "lottery" and gain Permanent Residency in the United States.

The mismanagement of the diversity visa program for 2007 is best exemplified by the numbers of visas that remains unused. Had the program been administered properly, Congress' intent would have been realized, and all 50,000 visas would have been used. Instead year after year District Courts across the country are experiencing an increased Number of Mandamus action filed by diversity visa winners, it is an alarming demonstration of the inability of the DOS to fulfil the mandate given by the American people through the Congress to manage Diversity Visa application

Accordingly, the writ of mandamus confers this Court with the power to compel the Defendants to perform the duty they owe to the Plaintiffs. Plaintiff has complied with each and every requirement for the visa, and is eligible for, with the exception of the ministerial name check clearance.

The Plaintiff should not be penalized and lose their ability to gain Permanent Residency in the United States, simply **because the Defendants cannot figure out how to adjudicate the diversity visa program in a timely manner. There is no other program in which the Defendants are under such a time constraint.**

As such, this application must be given the time and attention that Congress imposed on an expedited basis, and the Government has conceded such in a similar case.[11]

-------------------------------------------------------------------------------------------------
11 In a similar action filed in this Court, Shidlovskaya v. BCIS, Civil Action No. CV-03-4004, before the Honorable Charles P. Sifton, the BCIS and the FBI agreed to expedite the name check clearances. The name check clearances were conducted within a few days, and the Plaintiffs' applications for Legal Permanent Residency were approved on September 19, 2007. The Defendants should now be estopped from claiming that they do not have a duty to adjudicate this Plaintiffs' applications for Legal Permanent Residency. To do otherwise, raises serious constitutional violations. As the Second Circuit has held, the DOS must apply its policies uniformly in all cases. The Court said that "the sometimes yes, sometimes no, sometimes maybe" approach by an agency is not acceptable. *See*, Vargas v. DOS, 938 F.2d 358 (2d Cir.

## C. 8 U.S.C. § 1252(a)(2)(B)(i) Has No Application Here

The government fails to heed the teaching of American Arab Anti-Discrimination Committee, that restrictions on court jurisdiction in IIRIRA must be carefully scrutinized and limited to their precise terms. *See also,* Abbott Laboratories v. Gardner, 387 U.S. 136, 141 (1967) ("[O]nly upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review [of agency actions]."

By its terms, 8 U.S.C. § 1252(a)(2)(B)(i) applies only to the denial of Legal Permanent Residency in removal proceedings since this provision forms a part of the statutory provision governing judicial review of removal orders. *See*, Mart, 94 F.Supp.2d at 1120 (history, structure and title of Section 242 as well as presumption in favour of judicial review support conclusion that Section 242(a)(2)(B)(i) limits review of decisions only on review of removal orders).

Indeed, the government even conceded as much in Burger, 1999 U.S. Dist. Lexis 4854 at 11 ("Defendants concede that this provision directly abolishes judicial review of status denials only if such denial arises out of the appeal of a removal order.").[14] Accordingly, Burger soundly rejected any claim that 8 U.S.C. §1252(a)(2)(B)(i) bars subject matter jurisdiction here. *See also* Shanti, Inc. v. Reno, 36 F.Supp. 2d 1151 (D. Minn. 1999) (rejecting similar argument by government based on companion terms of Section 1251(a)(2)(B)(ii) because the plain words "are inherently limited in applicability to review of removal orders"); Rogan v. Reno, 1999 U.S. Dist. Lexis 18258 (E.D.N. Y. Oct. 25, 1999) (Spatt, 1991) (jurisdictional limitation in 8 U.S.C. §1252 applies only for

review of removal orders); Fu v. Reno, 2000 U.S. Dist. Lexis 16110 (N.D. Tex., Nov. 1, 2000) (applying same logic to reject contention that Section 242(g) applies outside removal context).

Moreover, the inapplicability of 8 U.S.C. §1252(a)(2)(B)(i) as a jurisdictional bar in this case becomes crystal clear from an examination of the structure of this statutory provision. *See, e.g.* Davis v. Michigan Dept. of Treasury, 489 U.S. 803, 809 (1989) ("fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme...."). Thus 8 U.S.C. §1252(a)(1) provides for jurisdiction to review removal orders. From this general grant of jurisdiction to review removal orders, §1252(a)(2), in turn, exempts certain matters, the review of denials as provided in §1252(a)(2)(B)(i).

In other words the structure of the statute confirms that §1252(a)(2)(B)(i) is merely a limitation on the grant of jurisdiction in §1252(a)(1) to review removal orders, and not a limitation on the jurisdiction of federal courts to review an decision outside removal proceedings the same principle can be applied here , the plaintiff does not pray the court to review the decision of a consular officer because it has no jurisdiction to do so and also because of the failure of the consular officer in actually taking a decision therefore there is No decision to review here . While the title of 8 U.S.C. §1252 ("Judicial Review of Orders Of Removal") and the headings of subsection (a)(1) ("General orders of removal") and (a)(2) ("Matters not subject to judicial review") certainly support this conclusion, the structure of the statute should be dispositive. *See, e.g.*, Almendarez-

Torres v. United States, 523 U.S. 224, 234 (1998) (recognizing that titles and headings

are proper tools for statutory construction); Connecticut v. Department of Interior, 228

F.3d 82, 88 (2d Cir. 2000) (while recognizing support from title in statutory construction,

"reliance is not on the title but rather on the structure of the statute.").

If the plain language and structure of §1252 were not enough, Congress in enacting

IIRIRA made abundantly clear when certain immigration benefits were to be immune

from judicial review even if not requested in removal proceedings, and pointedly omitted

Legal Permanent Residency from this list. *See*, DOS v. Cardoza-Fonseca, 480 U.S. 421,

432 (1987) ("[w]here Congress includes particular language in one section of a statute

but omits it in another section of the same Act, it is generally presumed that Congress

acts intentionally and purposely in the disparate inclusion or exclusion.").

Thus both §212(h) and §212(i) of the Act, 8 U.S.C. §1182(h) and (i), allow for waivers,

respectively, of possible fraud or criminal bars to Legal Permanent Residency, and can be

requested in applications either before DOS or in removal proceedings. While Congress

provided in 8 U.S.C. §1252(a)(2)(B)(i) that decisions with respect to §212(h) and §212(i)

waivers could not be reviewed on judicial review of a removal order, Congress also took

care to provide a further limitation on judicial review of §212(h) and §212(i) waivers

outside removal proceedings. *See*, IIRIRA §§348,349.

Furthermore, despite the limitations in IIRIRA §§348, 349, Congress simply did not

enact any provision to limit judicial review of applications under Section 245 outside

removal proceedings. In short, when Congress wished to limit review of relief under the Act outside removal proceedings, the legislature did so expressly, and failed to do so in the case of under Section 245 of the Act. *See* Martin v. Hadix, 119 S.Ct. 1998 (Jun. 21, 1999); Lindh v. Murphy, 521 U.S. 520 (1997).

Moreover, in IIRIRA, Congress was certainly not reticent about limiting judicial review over certain immigration programs, but enacted no such limitation on the DV program. *Compare*, IIRIRA §377 (enacting limitation on judicial review for certain claims arising from legalization program).

Two other rules of statutory construction overlooked by the government support the Plaintiff's position on subject matter jurisdiction. The first is the presumption in favour of judicial review of administrative agency action and the requirement of an explicit limitation. *See, e.g.,* McNary v. Haitian Refugee Center, Inc., 498 U.S. 479 (1991), Mart, 94 F.Supp.2d at 1123. The second is that any ambiguity in an immigration statute should be resolved in favour of the alien. *See, e.g,* INS v. Errico, 385 U.S. 214, 225 (1966); Costello v. INS, 376 U. S. 120, 128 (1964); Fong Haw Tan v. Phelan, 333 U. S. 6, 10 (1948); Janvier v. United States, 793 F. 2d 449, 455 (2d Cir. 1986)("To the extent that there is any doubt as to Congress' intention, we resolve that doubt in construing [an immigration statute] as providing the alien as much protection as possible"); Lennon v. INS, 527 F.2d 187 (2d Cir. 1975) ("deportation statutes must be construed in favour of the alien").In Dinh v. Reno, 197 F.3d 427 (10th Cir. 1999), this case involved §1252(a)(2)(B)(ii) rather than §1252(a)(2)(B)(i).

While the Dinh panel chose to treat the case as a Bivens class action and to read

§1252(a)(2)(B)(ii) broadly in order to overturn an attorney's fee award under the Equal

Access to Justice Act ("EAJA") in a case involving a class of detained criminal aliens

under final orders of removal, that case involved none of the issue presented here.

Ironically, Moreover, the Dinh panel could have reached the same result, if that 10th

Circuit panel had simply applied the Second Circuit's decision in Boudin v. Thomas, 732

F.2d 1107 (2d Cir. 1983), holding habeas corpus proceedings not to be civil actions for

EAJA purposes.


Equally unpersuasive is Diallo v. Reno, 61 F.Supp.2d 361 (N.D. Ga. 1999) Thus Diallo[12]

simply overlooks the plain language of 8 U.S.C. §1252(a)(B)(i) while relying on 11th

Circuit precedent limiting judicial review that runs contrary to applicable law in this

Circuit. *See*, Henderson v. DOS, 157 F.3d 106 (2d Cir. 1998), cert. denied, 67 U.S.L. W.

3560 (March 8, 1999). 28 U.S.C. §1331 alone would suffice to confer subject matter

jurisdiction

---

12.Unlike the present case, Diallo was decided on a summary judgment record and involved what the District Court
found was a possible fraud that DOS was required to investigate.
Similarly, the Diallo Court emphasized that, unlike here, the Diallos had never been found qualified to receive a DV
visa.

### D. The Exhaustion Of Futile Administrative Remedies Is Not Required by Plaintiff

Exhaustion has not been required by statute and would be futile. *See* Mart I & II; Paunescu I & II. Instead, exhaustion would simply place the Plaintiffs' claims in a forum where relief could not be granted. Indeed, given the limitation on judicial review in 8 U.S.C. §1252(a)(2)(B)(i), mandating exhaustion would even preclude judicial review of plaintiffs' claims since IIRIRA has eliminated such review for applications in removal proceedings. Thus, far from creating a record for ultimate judicial review, exhaustion will destroy the opportunity for any such review.

Exhaustion is not required when administrative remedies are futile or provide no genuine opportunity for adequate relief. 72 F.3d at 291. *See also*, Maria v. INS, 1999 U.S. Dist. Lexis 13502 (E.D.N.Y. 1999) (Weinstein, J.) (exhaustion not required when administrative remedies are futile); Burger, 1999 U.S. Dist. Lexis 4854 at 8.In any event, the limited powers of Immigration Judges in removal proceedings underscore the futility of this asserted administrative remedy. If as the government argues, a federal court does not have the power to compel allocation of visa as part of any remedy in this case and must be content with fashioning equivalent equitable remedies, the BIA has made abundantly clear that Immigration Judges have no such equitable powers and cannot grant relief based upon estoppel. *See e.g*, Matter of Hernandez- Puente, Int. Dec. 3153 (BIA 1992). Moreover, the BIA has also held that Immigration Judges cannot invalidate agency action as unconstitutional. *See, e.g,.* Matter of Medina, Int. Dec. 3078 (BIA 1988).

Similarly, refusing to dismiss on exhaustion grounds, the absence of such equitable powers including the inability to invoke estoppel, makes removal proceedings an inadequate remedy. Furthermore, it is even doubtful whether Immigration Judges have the power to consider violations of the APA. *See* Matter of Hector Ponce de Leon, Int. Dec. 3261 (1996). *See also*, Mart, *supra*. Indeed, renewal of their applications for Legal Permanent Residency in removal proceedings is simply tantamount to denial with no judicial review. Thus in any such removal proceeding the USCIS will predictably argue, as the government does here, that expiration of the fiscal year 2007 DV program precludes a grant of visa because visas[19] are no longer available and the Immigration Judges will be powerless to review, much less remedy by injunctive or declaratory relief, the action or inaction of the DOS that resulted in the denial or failure to adjudicate applications causing the destruction of visa eligibility. *See*, Mart I & II; supra; Matter of Geronimo, 13 I & N Dec. 680 (BIA 1971) (Immigration Judges limited to issues of deportability and cannot review decision to institute proceedings). As Burger holds, in language directly applicable here, "The Immigration Judge and the BIA would be powerless to correct [the] underlying error, and the adjudication of the Legal Permanent Residency applications would be meaningless."[13]

---

[13] Indeed, the powerlessness of Immigration Judges in this matter is starkly illustrated by Marcetic v. DOS, 1998 U.S. Dist. Lexis 4870 (E.D. Ill. 1998), where in removal proceedings during fiscal year 1996, an Immigration Judge granted to a DV 96 winner but, through bureaucratic error, the visa was not allocated before the end of fiscal year 1996. Under these circumstances, INS refused to honor the Immigration Judge's decision and claimed that the alien had no remedy until the District Court ordered completion of the process.

**POINT III THE GOVERNMENT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM SHOULD BE DENIED**

In this case the plaintiff has valid claims for relief that should not be dismissed at the pleading stage. By contrast, the government appears to argue that the DOS is free to deny access to statutory benefits on any basis, however illegal, provided such illegal action is not corrected until the end of the fiscal year. Yet the DOS like all government agencies are bound to follow the law and should not be permitted to deny benefits on a legally impermissible basis, especially one that yields a constitutional violation.

**A. Plaintiff Have Valid Due Process Claims**

The government's attack on Plaintiff' due process claims at the pleading stage is limited to the claim that they have no protected interest. Yet, the Plaintiffs had satisfied all legal requirements for the diversity visa and presented no proper basis for denying their applications in the exercise of discretion.

Accordingly, this Plaintiff would clearly have a constitutionally protected interest under the Second Circuit's decision in Reno v. Perales, 48 F.3d 1305 (2d), cert. denied, 116 S.Ct. 699 (1995). Thus Perales, which involved a challenge to the administration of the legalization program assumed that "plaintiff class members have a protected interest in receiving amnesty based on IRCA's mandatory language that the Attorney General "shall grant eligible aliens legalized status." *See also*, Perales, citing with approval the language in McNary v. Haitian Refugee Ctr., 498 U.S. 479, 491 that the impact of a denial of legalization under special agricultural workers program is "plainly sufficient to mandate constitutionally fair procedures in the application process."

Similarly here, the Plaintiff had a protected interest in receiving Legal Permanent

Residency because he had satisfied all legal requirements for and there was no legitimate

basis for denying in the exercise of discretion. In short, unlike the prisoner transfer

provision at issue in Olim v. Wakinekona, 461 U.S. 238, 250-251 (1983), could not have

been denied in the exercise of discretion for any reason or no reason. Compare Matter of

Arai, 13 I & N Dec. 494 (BIA 1970) ("In the absence of adverse factors, will ordinarily

be granted, still as a matter of discretion."). Indeed, in ElkDOS v. Moreno, 435 U.S. 647,

667 (1978), the Supreme Court cites Arai as the latest binding immigration precedent for

the proposition that, absent adverse factors, an alien would be granted. For that reason,

the government's reliance upon cases where adverse factors were present is simply

irrelevant.


Furthermore, the argument supporting a protected interest here would seem especially

strong in those cases where Plaintiff was actually told by a chief consular officer of the

US Embassy of London that his case had been approved without mention of the

Washington clearance, especially if discovery shows that this clearance was received, an

issue that should be resolved in Plaintiff' s favour for purposes of this motion. Again, this

represents precisely the kind of issue that should not be resolved at the pleading stage,

without production of Plaintiff's immigration files. Moreover, as Reid recognized, can

only be revoked by formal recission proceedings under 8 U.S.C. §1256, which have not

been instituted.

At the very least, the Plaintiffs also have a property interest in the allocation of statutory benefits according to fair procedures which would certainly seem to be on a par with the right to apply for the discretionary benefit of political asylum that has been held to constitute a protectible interest, even though there is no right to asylum itself. Chun v. Sava, 708 F.2d 869, 877 (2d Cir. 1983); Augustin v. Sava, 735 F.2d 32 (1984); Haitian Refugee Center v. Smith, 676 F.2d 1023, 1038 (5th Cir. 1982).

Indeed, this result flows logically from the Supreme Court's decision in Logan v. Zimmerman Brush Co., 455 U.S. 429, 490 (1982), upholding the existence of a Fifth Amendment property right in administrative procedures. *See also* Richards v. Jefferson County, 116 S.Ct. 1761(1996), which reaffirms the continuing validity of Logan.

Among elementary requirements systematically violated here, timely request of clearance as directed by DOS, meaningful review of the evidence submitted by the applicant, and truthful statements to the applicant about the status of the application. *See*, Perales; Augustin, and Chun. In other words, due process would impose upon the DOS only the modest burden of following prescribed administrative procedures and telling the truth. *See also*, Waldron v. DOS, 17 F.3d 511 (2d Cir.), cert. denied., 513 U.S. 1019 (1993) ("Careless observance by an agency of its own administrative processes, weakens its effectiveness in the eyes of the public because it exposes the possibility of favouritism,discrimination and inconsistent application of the law.").

**In short, Plaintiffs do have valid due process claims and the government's arguments for dismissal find no support in the ancient principle that a consular officer's denial of a visa is not subject to judicial review, a matter that is simply not at issue here.** *Compare*, Silva v. Bell, 605 F.2d 978 (7th Cir. 1979) (judicial review and broad injunctive relief allowed to correct government errors in allocation of immigration visas arising from erroneous charging of Cuban Act visas against Western Hemisphere quota); Paunescu II (visa allocation order for DV winner); Marcetic (same).

Additionally, the Plaintiff's experience of the procedure used by the DOS in adjudicating applications which was arbitrary and capricious:

As a standard procedure the Kentucky consular center process a first security checks (IBIS) before submitting the visa application to the Embassy. On the Day of the interview (10th January 2007) a "problem "on the system required for the interviewing officer to go through a name check (a full set of fingerprints and digital pictures were taken).

In short what the plaintiff is stating is the DOS had many opportunities to actually go through the security clearance instead of letting the case just expiring. It would be immoral for the plaintiff to fall victim to such a blatant mismanagement. Making this case even stronger is the Defendants inability to claim that the plaintiff was negligent in any shape of form with the handling of his application

**B. Plaintiffs Have Valid Equal Protection Claims**

In this case the Plaintiff also has valid claims under the equal protection component of

due process under the Fifth Amendment that should not be dismissed at the pleading

stage. Thus in Village of Willowbrook v. Olech, 2000 U.S. Lexis 1540 at 3 (2000), the

Supreme Court recently sustained an equal protection complaint against dismissal where

Plaintiffs had alleged that a municipality demanded a larger easement for water supply

connection for them than for others similarly situated expressly holding that "[o]ur cases

have recognized successful equal protection claims brought by a "class of one," where

plaintiff has been intentionally treated differently from others similarly situated and that

there is no rational basis for the difference in treatment." By contrast the government's

reliance upon Jackson v. Mann, 196 F.3d 316 (2d Cir. 1999), hardly

supports a Rule 12(b)(6) motion, for in Jackson, the *pro se* prisoner's claim of religious

discrimination was rejected on summary judgment, only after discovery had yielded no

supporting evidence.


Here, the Plaintiff's allegations must be taken as true and these are that Plaintiff'

s application for a diversity visa was denied because the Defendants failed to complete

the processing of the diversity visa applications in violation of statute, regulation, and

standard operating procedures. First, there is definitely an issue in this case as to when

the request for clearances were forwarded to the FBI and the CIA, and if proper

procedures were followed in the processing of these requests. Second the preliminary

evidence shows that the entire DV 2007 program was run by the Defendants with no

rhyme or reason and those approvable cases were simply not thoroughly processed, and

were instead place on a shelf only to be denied after September 30, 2007. In this regard, we are aware of the following cases which support the plaintiff's position and must be considered by the Court. In a similar case filed in the Eastern District of New York, Ching v. BCIS, 03-CV-4677, the Honorable Nina Gershon granted Plaintiffs' request for relief and ordered the Defendants, including the FBI, to complete adjudication of Plaintiff's applications for Legal Permanent Residency immediately, but in any event, no later than September 30, 2007. *See*, copy of Judge Gershon's order annexed hereto as Exhibit "A," and transcript of her decision at Exhibit "B." In that case, as well, the only delay was the FBI clearances. As Judge Gershon found:I *'m very troubled by the idea that Congress clearly has intended that an unfairness in our immigration history be corrected and that visas be issued and that the program not be stymied by delays in completing the processing and in each of these cases I have a situation where the Plaintiffs has fulfilled all of the obligations that a Plaintiff must fulfill or applicant must fulfill, that agencies have acknowledged that, everything has been done including the fingerprint check and the only thing that remains is the name check process. As I've said, the details, which only the Defendants are privy to as to these two individuals which might support a basis for saying that they legitimately need more time that would justify them not completing the process by September 30th which is the deadline, they just haven't provided that. So, in light of all that, I am going to issue an order, I'm satisfied that having reviewed all of these cases submitted by the government and the Plaintiffs that the more persuasive position with regard to mandamus jurisdiction in this circumstance is the position taken that was taken by Judge Edelman in the Paunescu case, which is 76 F. Supp. 2d 896, and I believe that it's Section 1255 and INA 1153(c) taken together which provides*

*mandamus jurisdiction to direct that this ministerial act of adjudicating the Plaintiffs*

*applications for Legal Permanent Residency based upon the Diversity Visa program be*

*effectuated.*

In that case, the FBI clearances were conducted overnight, and the Plaintiff was granted

Legal Permanent Residency prior to September 30, 2007.

In the companion case, Przhebelskaya v. Ashcroft, 03-CV-3303, Judge Gershon order the

same relief. However, the defendants failed to complete adjudication of plaintiffs'

applications before the visas "ran out". Thereafter, plaintiffs brought a motion seeking to

hold the defendants in contempt, and for an order compelling defendants to adjust the

status of the plaintiffs. In a well-reasoned decision issued on September 30, 2004, Judge

Gershon ordered the defendants to adjust the status of the plaintiffs to lawful permanent

resident status, even thought the diversity visa program from DV 2004 ended on

September 30, 2004. Judge Gershon found: "Because of the inexcusable bureaucratic

delay, those applications were denied. Thus, here, as in Paunescu, the agency's failure to

perform a non-discretionary duty within a reasonable time deprived plaintiffs of visas."

Paunescu, 76 F. Supp. 2d at 902." Opinion and Order at 11.

The Defendants also contend that in no event can visas be issued after September 30,

2007.However, in a diversity visa action filed, Tomaszewski v, Ashcroft, CV-04- 4030,

the Honorable Raymond Dearie, United States District Judge, signed an Order to Show

Cause ordering the Department of State to reserve visa numbers for the Plaintiffs in that

action pending final adjudication of their cases. Thereafter, the Defendants entered into a

Stipulation of Settlement in which they agreed to reserve visas for the Plaintiffs in that action and that they will continue to reserve those visas and make them available after September 30, 2004. As such, the Defendants should be estopped from claiming that visa numbers cannot be used after the fiscal year has ended.

In short, Plaintiffs' equal protection claim should survive a motion to dismiss for legal sufficiency. In short, these cases present agency action taken contrary to law, especially when other cases, similarly situated, were granted. *See, e.g.*, Vargas v. INS, 938 F.2d, 358, 362 (2d Cir. 1991) (condemning "[p]atently inconsistent application of agency standards to similar situations" as irrational, arbitrary and capricious); United States v. Diapulse, 748 F.2d 56, 62 (2d Cir. 1984)  ("Deference to administrative discretion or expertise is not a license to a regulatory agency to treat like cases differently."); Tapis International v. INS, 94 F.Supp.2d 172 (D. Mass. 2000) (agency abuses discretion by basing decision on legally impermissible ground).

**C. Plaintiff Has Valid APA Claims**

As discussed supra, Section 706(1) of the APA permits the Court to "compel agency

action unlawfully withheld or unreasonable delayed." 5 U.S.C. §706(1). The Second

Circuit has observed that: "In determining reasonableness [for purposes of section 6 of

the APA], we look to the source of the delay–*e.g.*, the complexity of the investigation as

well as the extent to which the defendant participated in delaying the proceeding." Reddy

v. Commondity Futures Trading Comm'n, 191 F.3d 109, 120 (2d Cir. 1999). The

overwhelming evidence is that the Plaintiffs submitted the necessary documentation, and

that the Defendants failed to process the fingerprints and the name check clearances in a

timely manner. As the Court held in Kim, "although it is entirely possible that this delay

is reasonable, there is insufficient information upon which to base such a determination at

this stage of the proceedings." Kim, 2004 WL 1687201. Accordingly, the Court denied

the defendant's motion to dismiss. In this action, however, we have more information

than the Court did in Kim.

We know that expedite requests can and have been done in a day, as they were done in

the Basov's case. Yet, the government still fails to present any evidence whatsoever why

such clearances were not completed promptly.

At the very least, the Court should find subject matter jurisdiction and allow this action to

proceed to discovery so that the Plaintiffs are able to gather the information that the

Defendants have thus far failed to provide. Given the particular facts and circumstances

in these cases, it is clear that the Defendants have failed to act reasonably, and in fact,

provide absolutely no information regarding any actions they have taken. Such inaction is in clear violation of Section 6 of the APA, and cannot be condoned. *See*, Bartolini v. Ashcroft, 226 F. Supp.2d 350 (D. Conn 2006) (federal question jurisdiction existed over alien's claim based on right to have DOS adjudicate his application for Legal Permanent Residency within a reasonable time as required by the APA). Moreover, given that Congress explicitly mandated that the diversity visa program expires on September 30th of each fiscal year, it follows that Congress' intended the adjudicating agencies to abide by the statute and regulations and adjudicate diversity visa cases by September 30th.

Finally, Ngwanyia v. Ashcroft, 302 F. Supp. 2d 1076 (D. Minn. 2004), the United States District Court for the District of Minnesota found that the defendants lacks statutory authority or regulatory authority to refuse to use over twenty-thousand refugee admission numbers made available for the  of asylees by the President and Congress for a given year. In so ordering, the Court held that the defendants had no power to extinguish the unused numbers no more than they have a right to create them. Id. at 1083. The Court found the failure of the defendants to use over twenty-thousand refugee admission numbers made available for the of asylees by the President and the Congress constituted "agency action unlawfully withheld or unreasonably delayed." Id.

**D. Plaintiff Has Valid Estoppel Claims**

Estoppel may also furnish a basis for relief, especially given the conduct by the

Defendants in the adjudication of Plaintiffs cases and representations made to the Court

in this action when initially filed. First, the DOS engaged in affirmative misconduct in

representing to Plaintiff that his applications had been approved and found no reasons to

deny the plaintiff after the follow-up interview (10th August 2007) , than to dishonour

those representations after fiscal year 2007 had ended and deny due to a lack of visas.

Had the Defendants done that which they were required doing in a timely manner,

Plaintiff's application for a diversity visa would have been approved at the interview

stage, or at the very least visas reserved pending background clearances. This is

compounded by the fact that the government encouraged applicants to apply quickly,

accepted their applications without rejection or refund, and told applicants that their cases

had been approved or approved subject to security checks, only to tell them that their

cases had been denied because of the checks did not complete in time or visa

unavailability. Under these circumstances, affirmative misconduct sufficient to trigger

estoppel may well exist, especially if positive clearances had been received, and should

not be foreclosed at the pleading stage. In this regard, Fano v. O'Neill, 806 F.2d 1262

(5th Cir. 1987), is instructive. There the plaintiff asserted affirmative misconduct

establishing estoppel for the unexplained delay of INS in failing to interview him for

Legal Permanent Residency before he reached 21, which destroyed his eligibility to

receive a visa as the derivative beneficiary of his father. Under these circumstances, the

Fifth Circuit reversed a grant of summary judgment on a record that failed to explain any

reason for the delay, and on remand, the INS settled the case by granting the plaintiff

retroactively to the date his father had been adjusted despite his actual age. 64 Interpreter Releases 441, 442 (April 13, 1987). Similarly here, at this stage of the litigation, there has simply been no explanation for the misrepresentation by the DOS on Plaintiffs' applications, which would seem to be the clearest kind of affirmative misconduct especially since this affirmative misconduct, as in Fano, has served to destroy their eligibility for. *See also*, Corneil-Rodriguez v. DOS, 532 F.2d 301 (2d Cir. 1976); Galvez v. Howerton, 503 F.Supp. 535 (C.D. Cal. 1980).

Moreover, this is simply not a case as in Office of Personnel Management v. Richmond, 496 U.S. 414 (1990), where acceptance of the Plaintiffs' estoppel claims would require the disbursement of public funds contrary to law. Indeed, if anything, the DOS' affirmative misconduct may have procured funds to which the government was not otherwise entitled.

## POINT III THE CASE SHOULD NOT BE DISMISSED AS MOOT

Apart from the erroneous contention that the Plaintiff have not pleaded legally sufficient claims, the government seems to argue that Plaintiffs' claims should be dismissed as moot because of alleged limitations upon the possible relief that could be granted. At the most basic level, however, this argument simply confuses the merits with possible relief and hardly requires dismissal of Plaintiff's claims at the pleading stage. Thus in Perales v. Thornburgh, 967 F. 2d 798, 805 (2dCir. 1992), vacated and remanded on other grounds sub. nom. Reno v. Perales, –U.S.–, 113 S.Ct. 3027 (1993), the Second Circuit allowed challenges to the procedures employed by USCIS in administering the amnesty program

to go forward despite a government argument that available relief was severely limited. Doubts expressed about possible relief, however, do not come close to requiring dismissal under the standards governing Rule 12(b)(6) motions.

To avoid dismissal on mootness grounds, the court must determine that the parties continue to have a "legally cognizable interest in the outcome throughout the proceedings." Southern Oreg. Barter Fair v. Jackson Country, 372 F.3d 1128, 1133 (9th Cir. 2004). The party asserting the mootness bears the burden of establishing that there is no "effective relief remaining that the Court could provide. Id. at 1134. The Defendants have not met that burden, especially in light of the possible misrepresentations made to the Court regarding the exhaustion of visas.

Nor, despite the government's contrary arguments, have the plaintiff's claims somehow become moot with the end of the fiscal year. Indeed, those claims have no more become moot with the end of fiscal year 2007 than legal challenges to administration of amnesty under the Immigration Reform and Control Act ("IRCA") of 1986 were mooted out by the end of the legalization program. *See, e.g*, Perales, *supra*; Catholic Social Services v. Thornburgh, and LULAC v. U.S. DOS, 956 F.2d 914 (9th Cir. 1992), vacated on other grounds sub nom, Reno v. Catholic Social Services, 509 U.S. 43 (1993); In Re Thornburgh, 869 F.2d 1503, 1512 (D.C. Cir. 1989).

At bottom, the government's argument represents little more than a repackaged version of the claim rejected by the Court of Appeals in Perales that the end of the amnesty

program precluded relief for those who had been deterred from filing for amnesty by

illegal government action. Once again, moreover, the government's argument ultimately

confuses possible limitations upon relief with subject matter jurisdiction to entertain this

action in the first instance.

Finally, the government again overstates the limits on possible relief employing virtually

the same kinds of arguments that were rejected by Perales and other amnesty cases. *See*

Perales, 967 F.2d at 811–14 (presence of statutory deadline does not preclude ordering

injunctive relief consistent with Congressional purpose that extends filing deadline);

Catholic Social Services, *supra*, (same, court may extend the date for filing amnesty by

injunction); In Re Thornburgh, 869 F.2d 1503, 1512 (D.C. Cir. 1989) (statutory

deadline does not preclude due process challenges, constructive filing dates or other

forms of lesser relief such as temporary stays of deportation).

Plaintiffs here have found no substitute for the benefits illegally denied them and what is

at issue is whether a judicial remedy can be devised which will put them in a position

roughly analogous to where they would be if the benefits had not been improperly

withheld. Such a remedy can be fashioned here since the action was filed prior to

September 30, 2007, and there were visas available at that time, the Plaintiffs should be

put in the position they were at the time the litigation was filed.

The defend must be estopped from now claiming that this action is moot because the

visas have expired until they have rationally and reasonably proven their claims with

supporting evidence ( Plaintiff immigration files , published visa statistics for fiscal year

2007,etc...). As noted supra, diversity visas for the last two years have not been exhausted and should be used in this instance to the ameliorate the inequities that the Defendants have cause the Plaintiffs in this action.

Furthermore, the government's arguments about limits on possible relief considerably overstate the difficulties facing this Court in the exercise of its equitable powers should illegal agency action be found. *Compare* Mart, *supra*. Indeed, what has become known as the Silva litigation is instructive on the issue of available relief. *See, generally*, 1 C. Gordon, S. Mailman & S. Yale-Loehr, Immigration Law and Procedure §34.04 [5][a]. This litigation arose from what was found to have been the erroneous action of the government in charging s under the Cuban Act, Pub. L.89-732 against what was then the Western Hemisphere quota 14 leaving individuals otherwise eligible to adjust status without visa availability much like the plaintiff here.

In devising a remedy for this illegal agency action, the courts proceeded from the fundamental equitable principle relief should "restore the plaintiff to the enjoyment of the right which has been interfered with to the fullest extent possible . . ." Silva v. Bell, 605 F.2d 978 n. 13 (7th Cir. 1979). *See also*, Silva v. Bell, 76 C 4268 (ND Ill. 1978) ("Our goal in affording relief is to place the class members in the position they would be in absent the illegal charging policy"). In that connection, deportation of the Plaintiffs was enjoined and INS was directed to provide work authorization pending formulation of a relief plan which ultimately involved "recapture" of the unlawfully charged visa

allocation over a period of years. *See*, Silva, 605 F.2d; Avila v. Bell 78 C 1166 (ND Ill. 1980).

While consideration of ultimate relief is obviously premature at the present stage of this case, similar remedies could well be crafted in Plaintiff's case to put them, as near as possible, in the same position they would have been but for unlawful government action that deprived them of. Service policy on when cannot be granted based solely on the absence of a visa as discussed above.

Moreover, as concerns limitations on further relief, it is instructive to note that in 1977, Section 245 of the Immigration & Nationality Act of 1952, as amended (the "Act"), 8 U.S.C. §1255, was amended to delete any statutory requirement that a visa be available when was granted, retaining only the requirement in the present law that a visa be available when the application is filed. Again, allegedly difficult issues with respect to ultimate relief do not require dismissal of Plaintiff's claim at this stage.

---

14 The Silva situation is not without a perhaps more modern counterpart, for during a past fiscal year INS  miscounted the number of non-immigrant visas issued in the H-1B category (professionals coming to work in this country on a temporary basis), approving more petitions than authorized by possibly as much as 20,000. *See, e.g.,* 76 Interpreter Releases 1552 (Oct. 25, 1999)

Finally, Ngwanyia, 302 F. Supp. 2d at 1083, the Court that the defendants lacks statutory authority or regulatory authority to refuse to use over twenty-thousand refugee admission numbers made available for the of asylees by the President and Congress for a given year. In so ordering, the Court held that the defendants had no power to extinguish the unused numbers no more than they have a right to create them. Id. at 1083. The Court found the failure of the defendants to use over twenty-thousand refugee admission numbers made available for the asylees by the President and the Congress constituted "agency action unlawfully withheld or unreasonably delayed." Id. Such is the case here; the defendants were authorized by Congress to use 50,000 visas for the DV 2007 lottery, and have failed to use all 50,000 visas.

The Government will of course argue that the statute only authorizes those visas until the end of the fiscal year. However, where there is an ambiguity in the statute, the statute must be resolved in favour of the alien. INS v. St. Cyr,121 S.Ct. 2271, 2290 (2001) (recognizing the rule of lenity and "the longstanding principle of construing any lingering ambiguities in favour of the alien.").

**POINT IV THIS CASE WARRANTS EQUITABLE RELIEF**

Here, the Government has provided absolutely no reason for the non-adjudication of the Background checks or the failure of the DOS to insist that the adjudications be completed prior to September 30, 2007. Knowing the urgency of these cases, DOS' failure to monitor these cases and failure to request expedited action, clearly violates their duty to adjudicate cases in a timely manner. Yet, no reasons have been provided for the inaction of the DOS, if an expedite was actually requested by the US Embassy of London.

In a similar case filed in the Eastern District of New York, Ching v. BCIS, 03-CV- 4677,

the Honorable Nina Gershon granted Plaintiffs' request for relief and ordered the

Defendants, including the FBI, to complete adjudication of Plaintiff's application for

Legal Permanent Residency immediately, but in any event, no later than September 30,

2007. In that case, as well, the only delay was the security clearances.

As Judge Gershon found:*I'm very troubled by the idea that Congress clearly has

*intended that an unfairness in our immigration history be corrected and that visas be*

*issued and that the program not be stymied by delays in completing the processing and in*

*each of these cases I have a situation where the Plaintiffs has fulfilled all of the*

*obligations that a Plaintiffs must fulfill or applicant must fulfill, that agencies have*

*acknowledged that, everything has been done including the fingerprint check and the*

*only thing that remains is the name check process. As I've said, the details, which only*

*the Defendants are privy to as to these two individuals which might support a basis for*

*saying that they legitimately need more time that would justify them not completing*

*the process by September 30th which is the deadline, they just haven't provided that.*

*So, in light of all that, I am going to issue an order, I'm satisfied that having*

*reviewed all of these cases submitted by the government and the Plaintiffs that the*

*more persuasive position with regard to mandamus jurisdiction in this circumstance*

*is the position taken that was taken by Judge Edelman in the Paunescu case, which*

*is 76 F. Supp. 2d 896, and I believe that it's Section 1255 and INA 1153(c) taken*

*together which provides mandamus jurisdiction to direct that this ministerial act of*

*adjudicating the Plaintiffs applications for Legal Permanent Residency based upon the*

*Diversity Visa program be effectuated.*

Finally, in a diversity visa action filed in the Eastern District of New York, Tomaszewski

v, Ashcroft, CV-04-4030, the Honorable Raymond Dearie, United States District Judge,

signed an Order to Show Cause ordering the Department of State to reserve visa numbers

for the Plaintiffs in that action pending final adjudication of their cases. Thereafter, the

Defendants entered into a Stipulation of Settlement in which they agreed to reserve visas

for the Plaintiffs in that action and that they will continue to reserve those visas and make

them available after September 30, 2004. In that case, Plaintiffs are in fact in a worse

position than the Plaintiffs in this action, in that their applications for Legal Permanent

Residency have already been denied. However, the Defendants conceded and reserved

visas numbers for the Plaintiffs and have agreed to make them available after September

30, 2004. As such, the Defendants should be estopped from claiming that visa numbers

cannot be reserved at this stage. Since the district courts have "broad discretionary power

to fashion equitable relief," Legalization Assistance Project v. DOS, 976 F.2d 1198, 1210

(9th Cir. 1992) (District Court was authorized to require agency to use a specific

procedure in amnesty program), this Court should order the Defendants to grant the

Plaintiff application for Legal Permanent Residency. *See*, Paunescu, 76 F. Supp

## CONCLUSION

For all of the above reasons, the Government's motion to dismiss should be denied.

Dated: December 20th, 2007

Respectfully Submitted,

HENRI KELI

31 PARK GRANGE MOUNT

SHEFFIELD S2 3SP

UNITED KINGDOM

+44 7713165831

CERTIFICATE OF SERVICE

I hereby certify that on 20th of December 2007, I caused the foregoing Memorandum and all supporting documents to be served on defendants, addressed as follows:

CONDOLEEZA RICE, as Secretary of State

U.S. Department of state, 2201 C street NW, Washington DC20520

MAURA HARTY, as Assistant Secretary, Bureau of consular Affairs

U.S. Department of state, 2201 C street NW, Washington DC20520

STEPHEN A. "TONY" EDSON, as Deputy Assistant Secretary of State for Visa Services

U.S. Department of state, 2201 C street NW, Washington DC20520

The U.S. Attorney General

950 Pennsylvania Avenue, NW, Washington, DC 20530

The U.S. Attorney for the District of Columbia

501 Third Street, NW, Washington, DC 20001

# U.S. DEPARTMENT of STATE

Media Note

Washington, DC
July 18. 2006

## Diversity Visa Lottery 2007 (DV-2007) Results

The Kentucky Consular Center in Williamsburg, Kentucky has registered and notified the winners of the DV-2007 diversity lottery. The diversity lottery was conducted under the terms of section 203(c) of the Immigration and Nationality Act and makes available *50,000 permanent resident visas annually to persons from countries with low rates of immigration to the United States. Approximately 82,000 applicants have been registered and notified and may now make an application for an immigrant visa. Since it is likely that some of the first *50,000 persons registered will not pursue their cases to visa issuance, this larger figure should insure that all DV-2007 numbers will be used during fiscal year 2007

Applicants registered for the DV-2007 program were selected at random from over 5.5 million qualified entries received during the 60-day application period that ran from 12:00 AM on October 5, 2005, until midnight, December 4, 2005. The visas have been apportioned among six geographic regions with a maximum of seven percent available to persons born in any single country. During the visa interview, principal applicants must provide proof of a high school education or its equivalent, or show two years of work experience in an occupation that requires at least two years of training or experience within the past five years. Those selected will need to act on their immigrant visa'applications quickly. Applicants should follow the instructions in their notification letter and must fully complete the information requested.

Registrants living legally in the United States who wish to apply for adjustment of their status must contact the Bureau of Citizenship and Immigration Services for information on the requirements and procedures. Once the total *50,000 visa numbers have been used, the program for fiscal year 2007 will end. Selected applicants who do not receive visas by September 30, 2007 will derive no further benefit from their DV-2007 registration. Similarly, spouses and children accompanying or following to join DV-2007 principal applicants are only entitled to derivative diversity visa status until September 30, 2007.

Only participants in the DV-2007 program who were selected for further processing have been notified. Those who have not received notification were not selected. They may try for the upcoming DV-2008 lottery if they wish. The dates for the registration period for the DV-2008 lottery program will be widely publicized during August 2006.

-----------------------------------

* The Nicaraguan and Central American Relief Act (NACARA) passed by Congress in November 1997 stipulated that up to 5,000 of the 55,000 annually-allocated diversity visas be made available for use under the NACARA program. The reduction of the limit of available visas to 50,000 began with DV-2000.

### Diversity Visa Lottery 2007 Winners, by Geographic Region

#### AFRICA

ALGERIA - 912
ANGOLA - 13
BENIN - 218
BOTSWANA - 1
BURKINA FASO - 95
BURUNDI - 16
CAMEROON - 1,461
CAPE VERDE - 3
CENTRAL AFRICAN REP. - 13

ERITREA - 582
ETHIOPIA - 6,871
GABON - 42
GAMBIA , THE - 50
GHANA - 3,088
GUINEA - 146 -
GUINEA-BISSAU - 5
KENYA - 2,337
LESOTHO - 0

NAMIBIA - 8
NIGER - 62 -
NIGERIA - 9,849
RWANDA - 41
SAO TOME & PRINCIPE - 2
SENEGAL - 228
SEYCHELLES - 4
SIERRA LEONE - 540
SOMALIA - 160

Diversity Visa Lottery 2007 (DV-2007) Results

| | | |
|---|---|---|
| CHAD - 28 | LIBERIA - 734 | SOUTH AFRICA - 287 |
| COMOROS - 7 | LIBYA - 37 | SUDAN - 569 |
| CONGO - 687 | MADAGASCAR - 21 | SWAZILAND - 5 |
| CONGO , DEMOCRATIC | MALAWI - 18 | TANZANIA - 148 |
| - REPUBLIC OF THE - 42 | MALI - 76 | TOGO - 1,592 |
| COTE D'IVOIRE 308 | MAURITANIA - 17 | TUNISIA - 124 |
| DJIBOUTI - 11 | MAURITIUS - 8 | UGANDA - 213 |
| EGYPT - 7,229 | MOROCCO - 1,922 | ZAMBIA - 92 |
| EQUATORIAL GUINEA - 1 | MOZAMBIQUE - 4 | ZIMBABWE - 73 |

## ASIA

| | | |
|---|---|---|
| AFGHANISTAN - 80 | IRAQ - 80 | NEPAL - 1,529 - |
| BAHRAIN - 1 | ISRAEL - 126 | OMAN - 1 - |
| BANGLADESH - 5,901 | JAPAN - 333 | QATAR - 1 |
| BHUTAN - 2 - | JORDAN - 63 | SAUDI ARABIA - 27 |
| BRUNEI - 0 - - | NORTH KOREA - 6 | SINGAPORE - 46 |
| BURMA - 651 | KUWAIT - 42 | SRI LANKA - 383 |
| CAMBODIA - 177 | LAOS - 9 | SYRIA - 40 |
| HONG KONG SPECIAL | LEBANON - 86 | THAILAND - 81 |
| - ADMIN. REGION - 81 | MALAYSIA - 76 | TAIWAN - 398 |
| INDONESIA - 245 | MALDIVES - 0 - | UNITED ARAB EMIRATES - 19 |
| IRAN - 1,361 | MONGOLIA - 113 | YEMEN - 43 |

## EUROPE

| | |
|---|---|
| ALBANIA | 1,988 |
| ANDORRA | 0 |
| ARMENIA | 691 |
| ARUBA | 5 |
| AUSTRIA | 74 |
| AZERBAIJAN | 125 |
| BELARUS | 705 |
| BELGIUM | 57 |
| BOSNIA & HERZEGOVINA | 90 |
| BULGARIA | 1,674 |
| CROATIA | 40 |
| CYPRUS | 7 |
| CZECH REPUBLIC | 85 |
| DENMARK | 50 |
| ESTONIA | 40 |
| FINLAND | 33 |
| FRANCE | 380 |
| FRENCH POLYNESIA | 10 |
| FRENCH SOUTHERN AND ANTARCTIC LANDS | 1 |
| GUADELOUPE | 3 |
| MARTINIQUE | 2 |
| NEW CALEDONIA | 3 |
| REUNION | 8 |
| GEORGIA | 323 |
| GERMANY | 1,047 |
| GREECE | 41 |
| GREENLAND | 3 |
| HUNGARY | 138 |

EXHIBIT B



**FEDERAL BUREAU OF INVESTIGATION**
Criminal Justice Information Services Division
CLARKSBURG, W V  26306

Please note the stamp on the back of the enclosed
int card indicating the results of the search of the FBI
l Justice Information Services Division's files.

ire(s)

**Identification and Investigative
Services Section**

**FBI/DOJ**

The FBI Criminal Justice Information Services Division will accept the downloaded paper fingerprint
card only for the purposes of requesting an FBI Identification Record through Departmental Order
556-73. If you go to a law enforcement agency or private fingerprinting agency to be fingerprinted,
they may prefer to use a fingerprint card on standard card stock. You may use the fingerprint card
provided by the fingerprinting agency.

OCT 1 3 2007

Mr. Henri Keli
246-A Stadsring
Amersfoort 3811 HS
NETHERLANDS

Reference: F-2008-00010

Dear Mr. Keli:

On 3 October 2007, the office of the Information and Privacy Coordinator received your Freedom of Information Act (FOIA) request of the same date for the following records from year 2007:

1. **"The date when a name check for Henri KELI, born in Mamoudzou (Mayotte), FRANCE on 24 May 1972 was initiated."**
2. **"The date when a name check for Henri KELI, born in Mamoudzou (Mayotte), FRANCE on 24 May 1972 was completed."**
3. **"The date when a name check for Hassani YOUSSOUF, born in Mamoudzou (Mayotte), FRANCE on 24 May 1972 was initiated."**
4. **"The date when a name check for Hassani YOUSSOUF, born in Mamoudzou (Mayotte), FRANCE on 24 May 1972 was completed."**

We have assigned your request the reference number above.

In accordance with section 3.6(a) of Executive Order 12958, as amended, the CIA can neither confirm nor deny the existence or nonexistence of records responsive to your request. The fact of the existence or nonexistence of requested records is properly classified and is intelligence sources and methods information that is protected from disclosure by section 6 of the CIA Act of 1949, as amended. Therefore, the Agency has denied your request pursuant to FOIA exemptions (b)(1) and (b)(3). I have enclosed an explanation of these exemptions for your reference and retention.

CIA Information and Privacy Coordinator Scott Koch made this decision, which you may appeal to the Agency Release Panel, in my care, within 45 days from the date of this letter. You may include any additional information supporting your position or explaining why you think our initial decision is wrong.

Sincerely,

Scott Koch
Information and Privacy Coordinator

Enclosure

*Office of Communications*
**U.S. Department of Homeland Security**



U.S. Citizenship
and Immigration
Services

February 20, 2007

# USCIS Update

## USCIS CLARIFIES CRITERIA TO EXPEDITE FBI NAME CHECK
### *Federal Litigation Removed as Sole Basis to Expedite Check*

WASHINGTON – U.S. Citizenship and Immigration Services (USCIS) is no longer routinely requesting the FBI to expedite a name check when the only reason for the request is that a mandamus (or other federal court petition) is filed in the case.

USCIS may continue to request an expedited FBI name check if the case meets one of the other approved criteria, including:

1. Military deployment,
2. Age-out cases not covered under the *Child Status Protection Act*, and applications affected by sunset provisions such as diversity visas,
3. Significant and compelling reasons, such as critical medical conditions, and
4. Loss of social security benefits or other subsistence at the discretion of the USCIS District Director.

The FBI name check is an invaluable part of the security screening process, ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens. USCIS also requests an FBI name check to screen out people who seek immigration benefits improperly or fraudulently and ensure that only eligible applicants receive benefits.

Information about the FBI name check is available on the USCIS website at http://www.uscis.gov or by calling the USCIS National Customer Service Center toll free at 1-800-375-5283.

– USCIS –

On March 1, 2003, U.S Citizenship and Immigration Services became one of three legacy INS components to join the U.S. Department of Homeland Security. USCIS is charged with fundamentally transforming and improving the delivery of immigration and citizenship services, while enhancing our nation's security

U.S. Department of State Foreign Affairs Manual Volume 9 – Visas
SENSITIVE BUT UNCLASSIFIED
(Deliberative process, law enforcement information)

# 9 FAM APPENDIX G, 500
# WASHINGTON SPECIAL CLEARANCES
# (SECURITY ADVISORY OPINIONS)

*(CT:VISA-830;   08-16-2006)*
*(Office of Origin:  CA/VO/L/R)*

# 9 FAM 501  GENERAL GUIDANCE

## 9 FAM 501.1  When are Special Clearances Required?

*(CT:VISA-813;   06-07-2006)*

A special clearance from Washington, DC **is** mandatory in cases of name check-based hits, nationality-based requirements, or an alien's background and/or intentions while in the United States.  In any visa case a special clearance may be requested at the discretion of a consular officer.  You must request a Security Advisory Opinion (SAO) in the following circumstances.

(1)    The Consular Lookout and Support System (CLASS) name check returns a "DPT-00" hit, a "VGTO" hit or an actual or quasi-hit (preceded by the letter "P") for any of the INA 212(a)(3) ineligibilities, or any other Category I ineligibility or potential ineligibility relating to national security or foreign policy.  A discussion of National Crime Information Center (NCIC) hits appears in 9 FAM Appendix G, 600, "Processing Visa Cases with NCIC Hits".

(2)    You know or have reasonable ground to believe that the applicant may be subject to any of the 212(a)(3) ineligibilities, regardless of the results of the CLASS name check, based on information supplied during the application process or from other sources.  This includes cases where the consular officer plans to refuse the applicant under INA 214(b), but the officer also has reason to suspect the applicant might in any way be involved in terrorist activity.  This also includes cases that may be politically sensitive and should therefore be reviewed by the Department even if no ineligibility exists.

available CLASS hits, and all the data in Namecheck Detail. If you determine that a visa can be issued, note the original SAO's CID number and any other information relevant to the decision not to send a new SAO. The visa must be annotated: "Clearance received on (date)", with the date of the original visa office (VO) response.

b. If all of the conditions in paragraph 47 are not met, you must submit a new SAO. In such cases, posts must enter "FOLLOWUP SAO" in the "Additional Information (Optional)" field of the SAO request. This text should come before all other information entered into the Additional Information (Optional) field.

# 9 FAM 501.8  How long does a clearance request take?  Can it be expedited?

*(CT:VISA-813;  06-07-2006)*

a. The Coordination Division of the Visa Office (CA/VO/L/C) makes every attempt to respond promptly to SAO requests. Given the requirements for clearances by multiple agencies and offices, posts can expect a wait of a minimum of twenty (20) business days to receive responses, although some responses will arrive well within that time frame. However, complicated cases can take some time to resolve, particularly if there are other U.S. Government agency concerns to consider. If you wish to contact us about a case that has been pending for more than forty-five (45) business days, please first contact the Problem Resolution Unit at SAO Inquiries (saoinquiries@state.gov). For a pending case, include the date, CIDN number, and cable number of your original request and provide the full name and date of birth of the visa applicant. The Problem Resolution Unit will resolve the case if possible or forward it to the action officer if necessary. You may also contact us by fax at (202) 663-1553 or 663-1554 (secure), or by e-mail. Posts are invited to contact the Coordination Division with any questions, comments or suggestions about special processing requirements. Do not, however, give the SAO inquiries address to anyone outside the Department.

b. If you need expedited processing of an SAO, it is imperative that you explain the urgency of the case and provide a tentative itinerary. Urgent cases usually involve medical emergencies, humanitarian concerns or significant U.S. Government interest in the traveler's early arrival in the United States. Please note that the Department's ability to expedite clearance requests is limited due to the necessity to coordinate clearances with other agencies. Requests for expeditious handling should be made

U.S. Department of State Foreign Affairs Manual Volume 9 – Visas

SENSITIVE BUT UNCLASSIFIED

(Deliberative process, law enforcement information)

by entering "EXPEDITE REQUESTED" followed by a brief explanation of the urgency of the case and the applicant's tentative itinerary in the "Additional Information (Optional)" field of the SAO request. This text should come before all other information entered into the Additional Information (Optional) field. Please take care to follow these instructions fully to avoid unnecessary delays in responding to your request. The Department and other clearing agencies can handle only a small number of expedite requests. Posts should limit expedite requests to those urgent situations outlined above.

# 9 FAM 502  FIRST TIER:  "VISAS MANTIS" CLEARANCE REQUESTS

## 9 FAM 502.1  General Information

*(CT:VISA-813;   06-07-2006)*

a. A Visas Mantis is a request for the Department's security advisory opinion (SAO) regarding the potential illegal transfer of technology.  A Mantis request trumps all other types of SAO.  When required, a single Mantis request should be submitted instead of a Donkey, Bear, Condor, etc. Once a Mantis request is sent, you must suspend all action on the case until a reply is received.

b. Most special clearance procedures are triggered by clear and objective circumstances, such as the applicant's nationality, place of birth, residence or CLASS name check results.  However, the Visas Mantis clearance procedure was developed as a result of United States Government concerns that U.S.-produced goods and information are vulnerable to theft.  In cases of illegal technology transfer, the Department must rely, to a great extent, on the observations and judgment of consular officers in the field.  You should attempt to identify applicants (of any nationality) whose cases fall under the purview of section 212(a)(3)(A)(i)(II) of the Immigration and Nationality Act (INA) and involve fields on the Technology Alert List (TAL).  The primary program security objectives are to:

  (1)  Prevent the proliferation of weapons of mass destruction and missile delivery systems;

  (2)  Restrain the development of destabilizing conventional military capabilities in certain regions of the world;

**Testimony of Robert J. Garrity, Jr.**
**Deputy Assistant Director,**
**Records Management Division,**
**Federal Bureau of Investigation,**
**before the**
**House of Representatives**
**Committee on Science,**
**February 25, 2004**

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Mr. Chairman and members of the Committee, thank you for inviting Assistant Director Hooton here today to testify in this hearing, in which the Committee is reviewing the conflict between science and security in visa policy. Unfortunately, Mr. Hooton could not be here today, so I have been designated to provide testimony in his stead. My name is Robert Garrity, and I have served as an FBI Special Agent since 1976. I currently serve as the Deputy Assistant Director of one of the FBI's newest divisions, the Records Management Division (RMD). My goal today is to discuss the FBI's role in vetting foreign visa applicants under the Visa Mantis program. First, I would like to say that the FBI appreciates the Committee's interest in this subject and hopes that the General Accounting Office (GAO) found us both cooperative and forthcoming in developing their report on *Improvements Needed to Reduce Time Taken to Adjudicate Visas for Science Students and Scholars*.

<u>FBI Name Check Process</u>

The FBI receives information on the applicants from the Department of State via computer disc, cable, or manual (facsimile) submissions. The requests are entered into the FBI's National Name Check Program (NNCP). The information is searched against the FBI Universal Indices (UNI). The searches seek all instances of the individual's name and approximate date of birth, whether a main file name or reference. By way of explanation, a main file name is that of an individual who is the subject of an FBI investigation, whereas a reference is someone whose name appears in an FBI investigation. References may be associates, witnesses, co-conspirators, or victims whose names have been indexed for later retrieval. The names are searched in a multitude of combinations, switching the order of first, last, middle names, as well as combinations with just the first and last, first and middle, *et cetera*. It also searches different phonetic spelling variations of the names, especially important considering that many names in our indices have been transliterated from a language other than English.

**Testimony of Robert J. Garrity, Jr.**
**Federal Bureau of Investigation**

If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked, but now a human being must review the file or index entry to further refine the names "Hit" upon. If the search develops a name and birth date match, it is designated an "Ident." An "Ident" is usually easier to resolve.

Approximately 85% of name checks are electronically returned to the Department of State as having "No Record" within 72 hours. A "No Record" indicates that the FBI's Central Records System contains no identifiable information regarding this individual. By agreement with the Department of State, partially due to our concern about the time factors in approving visa requests, a "No Record" equates to a "No Objection" to the issuance of a visa. The investigative divisions in the FBI, (i.e., the Counterterrorism Division, the Counterintelligence Division, the Criminal Investigative Division, and the Cyber Division) do not review visa requests where there is no record of the individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth submitted within the last 120 days) are not checked and the duplicate findings are returned to State.

With the remaining 15% that were not immediately eliminated as a "No Record," because a name and birth date are not sufficient to positively correlate the file with an individual, additional review is required. A secondary manual name search usually identifies an additional 10% of the requests as also not being identical to an individual in our files, for a 95% overall "No Record" response rate. This is usually accomplished within a week of the request. The remaining 5% are identified as possibly being the subject of an FBI record. The FBI record must now be retrieved and reviewed. If the records were electronically uploaded into the FBI Automated Case Support (ACS) electronic record-keeping system, it can be viewed quickly. If not, the relevant information must be retrieved from the existing paper record. Review of this information will determine whether the information is identified with the subject of the request. If not, the request is closed as a "No Record."

The information in the file is reviewed for possible derogatory information. Less than 1% of the requests are identified with an individual with information that is derogatory or poses concern to the FBI about having access to sensitive or special U. S. technologies. These requests are forwarded to the appropriate FBI investigative division for further analysis. If the investigative division determines there is no objection to the visa request, the request is returned to the name check dissemination desk for forwarding to the Department of State. Results of the name check process are returned to the Department of State twice weekly by computer disc or telephonically in expedited requests.

**Testimony of Robert J. Garrity, Jr.**
**Federal Bureau of Investigation**

If there is an objection to the visa request, the investigative division will prepare a written Security Advisory Opinion and forward it separately to the Department of State. In instances where the investigative division determines it appropriate, that individual will be placed on a watch list. In reviewing these visa requests, the FBI has, in the past, identified individuals attempting to enter the United States who are of serious concern to the FBI.

I want to emphasize to you that the FBI is sensitive to the impact that delays in visa processing of students and scholars may have on business, education, foreign relations, and worldwide perceptions of the United States. With these considerations in mind, the FBI is working diligently with the Department of State toward the common goal of improving the expediency and efficiency of the visa clearance process. At the same time, the consequences of the FBI's mission on homeland security requires that our name check process be primarily focused on accurate and thorough results. This means that there are instances when the FBI's review of a visa request must require as much time as needed to obtain an unequivocally correct result.

<u>Processing Times</u>

The FBI's goal is to have all visa requests completed within 120 days. Attachment A illustrates the current status of how long it takes to complete Visas Mantis name checks. This status is current as of February 23, 2004. For Visas Mantis, the FBI received 1,522 requests in the month of January 2004 and by February 23 had resolved 1,334, or 88% of them. In the month of December 2003, the FBI received 1,446 Visas Mantis requests and by February 23 had resolved all but 130 of these requests for a 91% resolution rate. The percentages continue to rise over time, with 95% of Visas Mantis requests resolved within 90 days. Visas Mantis are particularly difficult to resolve due to the predominance of requests from China and the commonality of Asian names.

A common question we receive is, "How long does it take to complete a visa request name check?" As shown on the graph, 88% are completed in 30 days and 98% of the requests are resolved in 120 days. Most name check requests that are over 60 days old are the result of the time required to retrieve and review field office record information. Some delay occurs at substantive analysts' desks, but this is to be expected. These analysts are assigned to an investigative division and are primarily assigned to the analysis of intelligence reports from around the world in order to support on-going investigations, or to support the flow of intelligence to policy makers. Despite these significant and voluminous responsibilities, these are the best professionals to review information in our records and to then make an informed decision on whether a requester of a visa represents a threat to our homeland, or is interested in illegally acquiring

**Testimony of Robert J. Garrity, Jr.**
**Federal Bureau of Investigation**

targeted U. S. special technology. You will understand, however, that with the press of other business, the reviews of visa requests do not always achieve the analysts' highest priority in their assigned work. I would add, in response to one of the questions posed in the invitation to testify before this Committee, that the investigative divisions believe the information found in the Visas Mantis requests they review is of use in their other responsibilities.

## FBI Visa Tracking System

The FBI's name check application accurately tracks each visa request within the our name check process. At any moment, we are able to electronically retrieve the status of an individual request, including where it is within the name check process, determine which requests have been pending for a certain period of time, identify the FBI files associated with an individual, ascertain the result of a name search, identify the type of visa request, and generate the data found in Attachment A. This tracking capability serves not only the 200,000 visa requests submitted each year, but also the other 6.1 million requests submitted by over 70 other federal, state, and local agencies.

## Process Improvement

We are working together with the Department of State to ensure that all old visa requests are accounted for and processed. This is being accomplished through a systematic comparison between the FBI name checks and the Department of State's visa databases. We closely monitored student visa submissions for this school year and believe that we were able to meet this seasonal demand. We are using the National Academy of Sciences' data to assist us in monitoring our response time for both students and visiting scholars. We have a public inquiry system where we check the status of individual cases. This system has been helpful in identifying and resolving individual problems. We have not detected any systematic problems associated with our review process.

However, the FBI recognizes that the increase in numbers of requests necessitates the development of even more efficient processes in order to sustain the current pace of processing name check requests. We are in the process of implementing a number of interim improvements to minimize manual submissions by all agencies and increase efficiency within the name check process. In addition, the FBI has developed high-level functional requirements for a new name check application that would be compatible with these improvements. The new name check application is now undergoing review within the FBI's Information Technology Investment Management Process.

**Testimony of Robert J. Garrity, Jr.**
**Federal Bureau of Investigation**

Additionally, the FBI is participating in the development of the Department of State's new visa database. As the existing FBI name check system is a legacy system that serves numerous other agencies, the data from the new Department of State database must be translated before it can enter into the FBI's name check system. This is not an insurmountable obstacle. Current planning is focused on the optimum manner to move requests from the Department of State to the FBI. In the interim, the Department of State submits requests to the FBI from its new database by computer disc. This process is highly reliable and has improved processing times.

### Decentralized Recordkeeping System

As I stated earlier, a significant factor in any delay in the FBI responding to a visa name check is retrieval of information from paper files. While many FBI files are available electronically, the majority of Visas Mantis checks pending over 60 days require review of physical, paper records currently stored at one of approximately 265 locations worldwide. FBI files are currently stored at FBI Headquarters, all 56 field offices, many of the larger of our 400 resident agencies, several warehouses around the country, in records centers operated either by the National Archives and Records Administration (NARA) or a commercial concern, four large Information Technology Center facilities on the east and west coast, and at Legal Attaché offices worldwide. Delays result from NNCP personnel identifying a file's location and then requesting the relevant information from a field office. Time delays mount as field office staff search file rooms and then fax or ship copies of the needed file or a prepared summary to FBI Headquarters. This process, repeated for many tasks, not only dilutes the FBI's responsiveness, but also limits information sharing, a critical success factor in protecting the security of our homeland and working counterintelligence and counterterrorism cases.

One possible solution to these problems the FBI is exploring is the establishment of a central records complex where all of our closed paper files would be located, and our active files stored electronically. Our frequently requested closed files could be scanned and uploaded into our electronic record-keeping system, so that Agents and analysts worldwide would have instant electronic access to the information they require for their jobs.

### Conclusion

The FBI recognizes the importance of accurate and timely name check processing. I want to emphasize to you, this issue has the full attention of Director Mueller and Assistant Director Hooton. The FBI appreciates the interest of the

**Testimony of Robert J. Garrity, Jr.**
**Federal Bureau of Investigation**

Committee in this matter. To ensure the Committee's specific pre-testimonial questions have been answered, I have attached an addendum that discusses them directly. The FBI welcomes any further study by the GAO on this issue. I am prepared to answer any questions the Committee may have.

**Testimony of Robert J. Garrity, Jr.**
**Federal Bureau of Investigation**

<u>Addendum - Responses to Questions</u>

To ensure the Committee's specific pre-testimonial questions have been answered, they are recited here with the FBI answer:

**Q. How are Visa Mantis requests currently transmitted from the State Department to the FBI and from the FBI to the State Department?**

A. The FBI receives Visas Mantis requests from the Department of State via computer disc, cable, or manual (facsimile) submissions. Results of the name check process are returned to the Department of State twice weekly by computer disc or telephonically in expedited requests.

**Q. What is your internal process for tracking a Visas Mantis case? How often is that information available electronically? And how often must that file be located physically? What are your plans to fully automate this process? Have there been cases where a file has not been located and the applicant is still pending a response?**

A. The FBI's name check application accurately tracks each visa request within the our name check process. At any moment, we are able to electronically determine the status of an individual request, including where it is within the name check process, determine which requests have been pending for a certain period of time, identify the FBI files associated with an individual, ascertain the result of a name search, identify the type of visa request, and generate a status report. We do not keep track of how often a paper file must be located, as opposed to having the information in our electronic recordkeeping system. As stated in my testimony, each name check entails every combination of the first, middle, and last name, which means that records may be found responsive for each combination. In addition, often there is a combination of paper and electronic files for each name. So, with one name check there may be numerous files, both paper and electronic, on a combination of name variations. As our system cannot quantify these numbers for us, it is too large a task to manually count and I cannot state how many name checks have required paper files. However, on February 23 there were 203 names that were pending over 60 days. It would be safe to assume most of these name checks required review of paper files. While we intend to fully exploit information technology, the system will never be fully automated.

**Testimony of Robert J. Garrity, Jr.**
**Federal Bureau of Investigation**

Files and information must be reviewed by human beings, which cannot be automated.

Now, if the question is more appropriately, when will it be fully electronic or the paper records digitized, the answer depends on our success in building a new central records complex and relocating all closed files to that location where the files of interest can be scanned-on-demand by an agent or analyst. There have been instances where files have not been located, but by agreement with the State Department, the FBI may close a case administratively if there are no counterintelligence or counterterrorism files associated with the name.

**Q. What priority do Visas Mantis investigations have among other FBI work? How do you think these waits impact your ability, and the ability of other law enforcement agencies, to identify and capture a terrorist as opposed to simply preventing him or her from entering the country at that particular post?**

A. Within the NNCP, they are a very high priority together with other homeland security name checks. As stated, the NNCP can resolve 99% of the name checks, with only 1% of the names and related files having to be reviewed by an investigative division. Within the investigative divisions, review of these files is usually assigned to intelligence analysts. These analysts are primarily assigned to the analysis of intelligence reports from around the world in order to support on-going investigations, or to support the flow of intelligence to policy makers. Despite these significant and voluminous responsibilities, these are the best professionals to review information in our records and to then make an informed decision on whether a requester of a visa represents a threat to our homeland, or is interested in illegally acquiring targeted U. S. special technology. Despite the press of other business, the reviews of Visas Mantis requests by the investigative divisions generally are handled expeditiously.

As for the impact of these waits on the ability to identify and capture a terrorist as opposed to simply preventing him or her from entering the country, I am not sure that can be quantified. However, I can say that the investigative divisions believe the information found in the Visa Mantis requests they review is of use in their other responsibilities.

Page 8 of 9

Testimony of Robert J. Garrity, Jr.
Federal Bureau of Investigation

Q. **What steps are you taking to make [the] FBI's systems interoperable with the State Department, which recently invested about $1 million to upgrade its technology for transmitting Visas Mantis requests? Until systems are interoperable, how will information be transmitted and what impact will it have on processing time?**

A. The FBI is participating in the development of the Department of State's new visa database. Current planning is focused on the optimum manner to move requests from the Department of State to the FBI. In the interim, the Department of State submits requests to the FBI from its new database by computer disc. This process is highly reliable and has improved processing times.

Q. **How satisfied are you about the appropriateness of the cases referred for additional review under Mantis? Are consular officers providing agents with enough information and the right type of information in their requests?**

A. The name check process culls out 99% of the Visas Mantis submissions prior to review by the investigative divisions. The information they review is useful and is focused appropriately on sensitive technology.

Q. **What steps have you taken to improve the visa application vetting process? In light of the fact that there have been lengthy waits and there are still Mantis cases that have been pending more than 60 days, what measures do you have underway that will identify and resolve these cases?**

A. We are in the process of implementing a number of interim improvements to minimize manual submissions by all agencies and increase efficiency within the name check process. The FBI has developed high-level functional requirements for a new name check application that will be compatible with the new FBI information systems in development. These new information systems, over time, will eliminate dependence on the retrieval of paper files. The development of this new name check application is now undergoing review within the FBI's Information Technology Investment Management Process.

EXHIBIT F

by the Immigration Act of 1990, an annual limit of between 416,000 and 675,000 currently exists for family-sponsored preferences, employment preferences, and diversity immigrants.

**Family-sponsored preferences** consist of four categories: unmarried sons and daughters of U.S. citizens and their children; spouses, children, and unmarried sons and daughters of lawful permanent residents and their children; married sons and daughters of U.S. citizens and their spouses and children; and brothers and sisters of U.S. citizens aged 21 and over, and their spouses and children. The annual limit for family-sponsored preferences ranges from 226,000 to 480,000. (See Appendix 1 for more details on the limit calculations).

**Employment preferences** consist of five categories of workers (and their spouses and children): priority workers; professionals with advanced degrees or aliens of exceptional ability; skilled workers, professionals (without advanced degrees), and needed unskilled workers; special immigrants (e.g., ministers, religious workers, and employees of the U.S. government abroad); and employment creation immigrants or "investors." The employment preference limit is equal to 140,000 plus any unused family preferences from the previous year.

**Diversity immigrants** are nationals of countries with low rates of legal immigration to the United States. The annual Diversity limit has been 50,000 since 1999. Nationals of countries with more than 50,000 numerically limited admissions during the preceding five years are excluded from participating in the Diversity Program. The Office of Immigration Statistics (OIS) calculates

**Table 1.**
**Legal Permanent Resident Flow: Fiscal Years 2004 to 2006**

| Category of Admission | 2006 | | 2005 | | 2004 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total........................ | 1,266,264 | 100.0 | 1,122,373 | 100.0 | 957,883 | 100.0 |
| New arrivals................ | 447,016 | 35.3 | 384,071 | 34.2 | 373,962 | 39.0 |
| Adjustments of status....... | 819,248 | 64.7 | 738,302 | 65.8 | 583,921 | 61.0 |

Source: U.S. Department of Homeland Security, Computer Linked Applicant Information Management System (CLAIMS), Legal Immigrant Data, Fiscal Years 2004 to 2006.

**Table 2.**
**Legal Permanent Resident Flow by Major Category of Admission: Fiscal Years 2004 to 2006**

| Category of Admission | 2006 | | 2005 | | 2004 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total......................................... | 1,266,264 | 100.0 | 1,122,373 | 100.0 | 957,883 | 100.0 |
| Family-sponsored immigrants ................ | 803,335 | 63.4 | 649,772 | 57.9 | 632,877 | 66.1 |
| Family-sponsored preferences ............... | 222,229 | 17.6 | 212,970 | 19.0 | 214,355 | 22.4 |
| Unmarried sons/daughters of U.S. citizens ... | 25,432 | 2.0 | 24,729 | 2.2 | 26,380 | 2.8 |
| Spouses and children of alien residents .... | 112,051 | 8.8 | 100,139 | 8.9 | 93,609 | 9.8 |
| Married sons/daughters of U.S. citizens .... | 21,491 | 1.7 | 22,953 | 2.1 | 28,695 | 3.0 |
| Siblings of U.S. citizens .................. | 63,255 | 5.0 | 65,149 | 5.8 | 65,671 | 6.9 |
| Immediate relatives of U.S. citizens........ | 581,106 | 45.9 | 436,802 | 38.9 | 418,522 | 43.7 |
| Spouses ................................ | 339,843 | 26.8 | 259,144 | 23.1 | 252,193 | 26.3 |
| Parents................................ | 120,441 | 9.5 | 82,113 | 7.3 | 77,534 | 8.1 |
| Children............................... | 120,199 | 9.5 | 94,974 | 8.5 | 88,088 | 9.2 |
| Children born abroad to alien residents .... | 623 | | 571 | 0.1 | 707 | 0.1 |
| Employment-based preferences............... | 159,081 | 12.6 | 246,878 | 22.0 | 155,330 | 16.2 |
| Priority workers......................... | 36,960 | 2.9 | 64,731 | 5.8 | 31,291 | 3.3 |
| Professionals with advanced degrees ........ | 21,911 | 1.7 | 42,597 | 3.8 | 32,534 | 3.4 |
| Skilled workers, professionals, unskilled workers...... | 89,922 | 7.1 | 129,070 | 11.5 | 85,969 | 9.0 |
| Special immigrants ...................... | 9,539 | 0.8 | 10,134 | 0.9 | 5,407 | 0.6 |
| Investors.............................. | 749 | | 346 | | 129 | |
| Diversity programs......................... | 44,471 | 3.5 | 46,234 | 4.1 | 50,084 | 5.2 |
| Other categories .......................... | 259,377 | 20.5 | 179,489 | 16.0 | 119,592 | 12.5 |
| Parolees .............................. | 4,569 | 0.4 | 7,715 | 0.7 | 7,121 | 0.7 |
| Refugees and Asylees .................... | 216,454 | 17.1 | 142,962 | 12.7 | 71,230 | 7.4 |
| Refugee adjustments .................... | 99,609 | 7.9 | 112,676 | 10.0 | 61,013 | 6.4 |
| Asylee adjustments ..................... | 116,845 | 9.2 | 30,286 | 2.7 | 10,217 | 1.1 |
| NACARA¹ Section 202.................... | 661 | 0.1 | 1,155 | 0.1 | 2,292 | 0.2 |
| Cancellation of removal .................. | 29,516 | 2.3 | 20,785 | 1.9 | 32,702 | 3.4 |
| Subject to annual limit ................. | 3,566 | 0.3 | 5,188 | 0.5 | 2,566 | 0.3 |
| Not subject to limit (NACARA¹ Section 203).. | 25,950 | 2.1 | 15,597 | 1.4 | 30,136 | 3.1 |
| Haitian Refugee Immigrant Fairness Act..... | 3,375 | 0.3 | 2,820 | 0.3 | 2,451 | 0.3 |
| Other................................. | 4,802 | 0.4 | 4,052 | 0.4 | 3,796 | 0.4 |

¹ Figure rounds to 0.0