UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HENRI KELI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-1697 (RBW) |
| ) | ECF |
| CONDOLEEZZA RICE, ) | |
| Secretary of State, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

INTRODUCTION

Plaintiff, Henri Keli, has filed this complaint against the U.S. Department of State, to compel the issuance of an immigrant visa on the basis of the immigrant Diversity Visa ("DV") Program. Specifically, he requests a mandamus order for the issuance of an immigrant visa. In his Opposition to Defendants' Motion to Dismiss, Plaintiff offers no new information to refute Defendants' proffer that the Court is without subject matter jurisdiction, as consular decisions to grant or deny visas are not subject to judicial review. He also fails to rebut Defendants' argument in the alternative, that the case is moot because, as of September 30, 2007, all remaining numbers of the DV program expired. Plaintiff then raises a host of claims not raised in his complaint, all of which are also without merit. Accordingly, his complaint should be dismissed with prejudice.

BACKGROUND

Aliens born in eligible countries may register on-line with the U.S. Department of State for the DV Lottery Program. If selected in the DV lottery the alien is notified of the opportunity

1

to apply and application procedures. DV applicants lawfully present in the U.S. may file with the Department of Homeland Security's ("DHS") Citizenship and Immigration Services ("CIS"), formerly the Immigration and Naturalization Service ("INS"), for adjustment of status to lawful permanent residence. DV applicants lawfully present in the U.S. and those abroad may apply for an immigrant visa at an American consular post. A DV applicant applying for an immigrant visa at an American consular post abroad must submit an application, supporting documentation, be fingerprinted and interviewed. If and when a visa applicant establishes eligibility any required security clearances will be processed by other government agencies. In the interests of preserving administrative resources and maximizing efficiency for all visa applicants, security clearances are not processed for visa applicants until they establish their eligibility for the classification sought.

     As the Plaintiff was a DV applicant abroad he made his application to the American consular post in London. His application was timely considered but initially refused for failure to establish eligibility. The Plaintiff was able to establish his eligibility in August 2007 at his second interview. The consular post submitted the required security clearance and refused the Plaintiff's application pending the outcome. Pursuant to INA §204(a)(1)(I)(II) , 8 U.S.C. §115 4 (a)(1)(I)(II) , no visa may be issued under the Diversity Visa lottery program following the end of the fiscal year. "Aliens who qualify, through random selection, for a visa under section 203(c) shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected." *Id*. Additionally, Plaintiff now alleges that because he provided all required documents to qualify for a visa in a timely manner, the Court should go beyond its subject matter jurisdiction and review the consular officer's decision ultimately not to issue the

visa. *See* Opposition Brief ("Opp."), USDC Pacer Doc. No. 7 at 9.[1] As discussed below, it is legally of no moment whether Plaintiff completed his application, because the Court may not review the consular officer's decision in this case and the matter is moot.

## ARGUMENT

**I. The Court Lacks Subject Matter Jurisdiction.**

Preliminarily it should be noted that the D.C. Circuit has upheld, unequivocally, the doctrine of consular non-reviewability. *Bruno v Albright*, 197 F. 3rd 1153, 1158-1159 (D.C. Cir. 1999). *See also*, Defendants' opening brief ("MTD"), USDC Pacer Doc. No. 5 pp. 5-8. Thus, Plaintiff's argument that the Court has subject matter jurisdiction is without merit. *See* Opp. pp. 13-14. To support his position Plaintiff refers the Court to cases that either support Defendant's position that a DV Lottery Program matter is moot after the close of the fiscal year because no relief is available (as discussed in Section II, *infra*); or are distinguishable because they do not involve visa determinations by the Department of State and instead address aliens in the United States seeking review of actions by the former INS, now DHS.

Specifically, Plaintiff cites to *Iddir v. INS*, 166 F.Supp. 2d 1250, 1259 (N.D. Ill.2001), *Nyaga v. Ashcroft*, 323 F.3d 906 (11th Cir. 2003) and *Paunescu v. INS*, 76 F.Supp.2d 896 (N.D. Ill. 1999).[2] In these three cases the plaintiffs applied to the former INS for adjustment of status in the United States after winning the opportunity to apply in the DV Lottery Program. None of these cases support the proposition that courts have subject matter jurisdiction over the decisions

---

[1] Because no page numbers are provided on the Opposition Brief by the writer, Defendant will refer to page numbers stamped atop of the document by the Court's ECF system.

[2] Indeed, in its opening brief Defendants alerted the Court to the existence of these cases and discussed their importance to their fundamental argument. *See* MTD pp. 9-11 and n. 4.

of consular officers in issuing or refusing a visa abroad. Rather, these cases confirm that a visa is not available to the Plaintiff under the DV Lottery Program following the end of the fiscal year, as explained in detail below.

In *Iddir*, the Court distinguished two previous decisions in the same district in which orders for adjustment of status were entered against the INS, despite the expiration of the fiscal year. *Iddir,* 166 F.Supp. 2d at 1250. The *Iddir* Court noted that one of the previous cases, *Paunescu,* involved a plaintiff who was advised by INS, at his interview, that his application for adjustment of status under INA §245(i) would be approved, but the plaintiffs in *Iddir* were not. Further, the *Paunescu* court had issued a preliminary injunction ordering INS to adjudicate the adjustments for the lottery selectee and his spouse before the end of the fiscal year, but INS failed to do so. 166 F.Supp. 2d at 1259. In M*arcetic v. INS*, 1998 WL 173129 (N.D. Ill. 1998) the plaintiff had already been granted lawful permanent resident status by INS, but it failed to issue his lawful permanent resident card by the end of the fiscal year. The trial court ordered the INS to complete processing and issuance of the resident alien card. By contrast, *Iddir* was brought by plaintiffs who had not been "granted any determination in their favor by either the INS or any court" that would have required adjustment of status before the end of the fiscal year, and therefore neither of the other two cases applied. 166 F.Supp.2d at 1259. The Court held that Iddir's action was moot, recognizing that immigrant visa numbers could no longer be assigned and any order compelling the INS to adjudicate the applications would have been a futile act. *Id*. at 1260.

The Plaintiff also cites to *Nyaga v. Ashcroft*, 323 F.3d 906 (11th Cir. 2003), which does not support his claim that courts have subject matter jurisdiction over the decisions of consular

4

officers to issue or refuse a visa. *Nyaga* confirms that no relief is available to Plaintiff following the end of the fiscal year. In that case, the applicant living in the United States sought mandamus relief in the form of an order compelling the Attorney General and the INS, not the State Department to complete immediately all remaining process necessary to adjudicate his diversity visa application after the end of the fiscal year. The Court held:

> We agree with the Defendants that the phrase 'shall remain eligible to receive such visa' plainly means that aliens, like Nyaga, who have been randomly selected to qualify for a visa under the diversity visa program cannot be issued a visa after midnight of the final day of the fiscal year for which they were selected. As of midnight on September 30, 1998, Nyaga was no longer eligible to receive an immigrant visa. The INS's failure to process Nyaga's application does not extend Nyaga's statutorily-limited period of eligibility for a diversity visa. 'Eligible to receive such visa' is unambiguous, and because the phrase is unambiguous, our inquiry must end with the statute's plain language. In reaching this conclusion based on the statute's plain meaning, we are not alone. *See Iddir v. INS*, 301 F.3d 492, 500-01 (7th Cir. 2002) (concluding that even if the INS were to adjudicate applications after the fiscal year ended, visas could not be issued); *id*. at 502 (Flaum, J., concurring) (concluding that the plaintiffs are no longer eligible to receive visas); *Fornalik v. Perryman*, 223 F.3d 523, 526 (7th Cir. 2000); *Vladagina v. Ashcroft*, 2002 WL 1162426 (S.D.N.Y. Apr. 8, 2002) (unpublished); *Iddir v. INS*, 166 F.Supp.2d 1250, 1259 (N.D. Ill. 2001) (holding that '[t]he end of fiscal year 1998 was September 30, 1998, which means that plaintiffs are no longer eligible to receive visas'), aff'd on other grounds, 301 F.3d 492 (7th Cir.2002); *Zapata v. INS*, 93 F.Supp.2d 355, 358 (S.D.N.Y. 2000) ('The plain meaning of § 1154 is that after the fiscal year has ended on September 30, no diversity visas may be issued *nunc pro tunc* based on the results of the previous fiscal year's visa lottery.'); *Diallo v. Reno*, 61 F.Supp.2d 1361, 1368 (N.D. Ga. 1999).

*Nyaga,* 323 F.3d at 914-915.

In contrast to decisions of the former INS, the decisions of a consular officer to grant or refuse a visa are not subject to court review. *See, e.g., Centeno v. Schultz*, 817 F.2d 1212 (5th Cir. 1987), cert. denied, 484 U.S. 1005 (1988); *Li Hing of Hong Kong, Inc. v. Levin*, 800 F.2d 970 (9th Cir. 1986); *Ventura-Escamilla v. INS*, 647 F.2d 28 (9th Cir. 1981); *Rivera de Gomez v.*

*Kissinger*, 534 F.2d 518 (2d Cir.), *cert. denied*, 429 U.S. 987 (1976); *U.S. ex rel. Ulrich v. Kellogg*, 30 F.2d 984 (D.C. Cir.), *cert. denied*, 279 U.S. 630 (1929); *Romero v. Consulate of the U.S., Barranquilla*, 860 F. Supp. 319 (E.D. Va. 1994); *Garcia v. Baker*, 765 F. Supp. 426 (N.D. Ill. 1990); *Hermina Sague v. United States*, 416 F. Supp. 217 (D.P.R. 1976). This well-settled doctrine is supported by Supreme Court precedent, the legislative history of the INA, and the terms of the statute itself.

Plaintiff also states that Defendants have a mandatory duty to adjudicate applications for legal permanent residency. *See* Opp. p. 14. Not so. Applications for lawful permanent residency are made by aliens present in the United States and adjudicated by USCIS, which is not a party to the instant matter. In this matter, the Plaintiff applied for an immigrant visa and the Defendants adjudicated the Plaintiff's visa application in a timely manner in accordance with all law and regulations. No duty is owed to Plaintiff by Defendants to process an application Plaintiff has not filed and Defendants have no authority to adjudicate a change in legal status.

**II. The Case Should be Dismissed as Moot**.

The United States Constitution limits this Court's jurisdiction to "live cases and controversies. A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome. Where a case is moot, it must be dismissed as non-justiciable." *Stotts v. Community Unit School District No. 1*, 230 F.3d 989, 991, *quoted in Iddir v. INS*, 166 F.Supp.2d 1250, 1258-59 (N.D. Ill. 2001).

As discussed above, and at length in the opening brief (*see* MTD pp. 8-12) the case is moot as there is no relief available to Plaintiff as of the close of the fiscal year, in this case September 30, 2007. None of the case law cited by the Plaintiff stands for the proposition that a

6

visa can be issued in connection with the DV Lottery Program after the end of the fiscal year. Plaintiff instead cites to case law regarding INS, now DHS, and adjustment of status to lawful permanent resident of aliens in the United States under laws other than INA §203(c), 8 U.S.C. §1153(c), the provisions governing issuance or refusal of visas in connection with the DV Lottery Program.

### III. The Court Does Not Have Administrative Procedure Act Jurisdiction in this Matter.

Plaintiff alleges that the Court has jurisdiction pursuant to the Administrative Procedure Act ("APA"). *See* Opp. pp. 15 and 37-38. However the APA does not apply to decisions of consular officers regarding visa issuance. Plaintiff cites no law in support of his argument. *Id*.

Indeed, the D.C. Circuit, in *Bruno v. Albright*, determined the doctrine of consular nonreviewability precludes review under the APA. *Bruno v Albright*, 197 F. 3d 1153, 1158-1159 (D.C. Cir 1999). The Court states the "presumption" of judicial review under the APA, §702, has several exceptions: "There are two notable qualifications. The validity of agency action may not be tested in court if statutes preclude judicial review or if agency action is committed to agency discretion by law." *Bruno* 197 F.3rd at 82 (internal quotations omitted).

As revised in 1976, § 702 itself contains another qualifying clause. It provides that "Nothing herein"--which includes the portion of § 702 from which the presumption of reviewability is derived-"affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground," 5 U.S.C. § 702(1). The House Report accompanying this amendment described these "other limitations" as including "express or implied preclusion of judicial review." H.R. REP. No. 94-1656, at 12 (1976). The Administrative Conference of the United States, which had proposed

the specific language enacted as § 702(1), explained that the courts would still refuse 'to decide issues about foreign affairs, military policy and other subjects inappropriate for judicial action.' 1 Recommendations and Reports of the Administrative Conference 191, 225.  On the same subject, the Administrative Conference pointed out that "much of the law of unreviewability consists of marking out areas in which legislative action or traditional practice indicate that courts are unqualified or that issues are inappropriate for judicial determination." *Id*." *Bruno*, 197 F. 3d at 84-85.  The Court then concluded that §702 review of the consular decision at issue in that case (which, as here, related to a consular determination regarding visa refusal) is precluded by the provisions of both 701(a)(1) and 702(1):

"Whether analyzed in terms of § 702(1), or in terms of § 701(a)(1), the conclusion is the same--the district court rightly held that it could not entertain Saavedra's lawsuit.  The overriding consideration is the nature of consular visa decisions." *Bruno* 197 F. 3d at 83.  The Court provided further discussion of the limitations under 701(a)(1): "Or from the principles just discussed we may infer that, in the words of APA § 701(a)(1), the immigration laws 'preclude judicial review' of the consular visa decisions." *Bruno* 197 F. 3d at 85.

> To put the matter in terms of APA § 701(a)(1), we may infer that the immigration laws preclude judicial review of consular visa decisions. There was no reason for Congress to say as much expressly. Given the historical background against which it has legislated over the years, including even the congressionally- overruled *We Shung* decision, 352 U.S. at 184 n. 3, 77 S.Ct. 252, Congress could safely assume that aliens residing abroad were barred from challenging consular visa decisions in federal court unless legislation specifically permitted such actions.  The presumption, in other words, is the opposite of what the APA normally supposes. In this respect the case is similar to *Dep't of the Navy v. Egan*, 484 U.S. 518, 527, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988).  *See Peoples v. United States Dep't of Agric.*, 427 F.2d 561, 567 (D.C. Cir.1970).  When it comes to matters touching on national security or foreign affairs--and visa determinations are such matters--the presumption of review 'runs aground.' 484 U.S. at 527,

> 108 S.Ct. 818.  This much follows from the Court's instruction that APA review may be foreclosed by virtue of 'the collective import of legislative and judicial history behind a particular statute ... [or] by inferences of intent drawn from the statutory scheme as a whole.'  *Block v. Community Nutrition Inst.*, 467 U.S. 340, 349, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), relied upon in Egan (484 U.S. at 530, 108 S.Ct. 818).  It follows as well from the Court's recurring statements, of which *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. at 543, 70 S.Ct. 309, is an example, that there may be no judicial review of the decisions to exclude aliens unless Congress has 'expressly authorized' this.

*Bruno*, 197 F. 3d at 86, 87.

In terms of APA § 702(1), the doctrine of consular nonreviewability--the origin of which predates passage of the APA--thus represents one of the "limitations on judicial review" unaffected by § 702's opening clause granting a right of review to persons suffering "legal wrong" from agency action.  As the report of the Administrative Conference on § 702(1) put it, this is an area "in which legislative action [and] traditional practice indicate that courts are unqualified or that issues are inappropriate for judicial determination."  *Bruno,* 197 F. 3d at 85.

If, as suggested by Plaintiff, (*see* Opp. pp. 15 and 37-38), the APA provided a basis to review consular visa determinations, there would be no basis for the doctrine of consular reviewability.  Courts, and the D.C. Circuit in particular, have recognized without exception that they do not have the jurisdiction, under the APA or otherwise, to review consular visa determinations.  For this reason, Plaintiff does not cite a single case that would recognize judicial review of consular visa determinations.

### IV. Mandamus Does Not Lie in Cases Where the Doctrine of Consular Nonreviewability Applies.

As discussed above, the cases cited by Plaintiff of *Nyaga v. Ashcroft*, 323 F.3d 906 (11th Cir. 2003) and *Paunescu v. INS*, 76 F.Supp.2d 896 (N.D. Ill. 1999) do not support mandamus jurisdiction over the actions of consular officers in adjudicating visa applications. Rather these cases discuss mandamus jurisdiction over the former INS, now DHS. However as discussed above, the decisions of a consular officer to grant or refuse a visa are not subject to court review. *Bruno v. Albright,* 197 F. 3rd 1153, 1158-1159 (D.C. Cir 1999). Accordingly, Plaintiff's request for mandamus (*see* Opp. pp. 16-21) should be denied.

### V. Plaintiff's Other Arguments, Not Raised in the Complaint, are Without Merit.

#### A. Plaintiff Does Not Have Valid Due Process or Equal Protection Claims.

Plaintiff has raised no due process or equal protection claim in his complaint, but attempts to broaden his complaint via his opposition brief. *See* Opp. pp. 29-36. He has no claim to Constitutional protections as an alien outside the United States. A alien outside the United States has no constitutional right of entry to this country as a non-immigrant or otherwise, *Kleindienst v. Mandel*, 408 U.S. 753, at 762, 92 S.Ct. 257 (1972). Therefore his request for relief under the United States Constitution should be denied.

#### B. Plaintiff Has No Valid Estoppel Claims.

Plaintiff again raises for the first time in his opposition brief that he is entitled to equitable stopple here. *See* Opp. pp. 39-40. He has not made a colorable estoppel claim as no benefit was promised to him. To justify estoppel against the government, a plaintiff must show justifiable reliance on their part and affirmative misconduct on the part of the government. *See*

*Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414 (1990) (No equitable estoppel against the government absent affirmative misconduct); *INS v. Miranda*, 459 U.S. 14 (1982), (holding "If government could ever be held to be equitably estopped it would only be in a case in which the government engaged in affirmative misconduct."); *International Fid. Ins. v. United States INS*, 623 F. Supp 45 (S.D.N.Y. 1985), (noting that there can be no estoppel against the government founded solely on delay). Plaintiff's allegations fail on both counts.

Here, the Plaintiff could not justifiably claim that he relied on his selection for the DV Lottery Program as basis for an equitable estoppel claim. Plaintiff had ample warning that the approval of his petition was no guarantee that a visa would be issued. *See e.g.* MTD Exh. A, p. 1 (no guarantee of visa issuance even if applicant meets all qualifications). Even if Plaintiff's assertions about "winning" an opportunity to apply for a visa are taken as true, it would not have been reasonable for Plaintiff to have acted in reliance on those assurances, given the warnings contained in the notice. *See Id.* and Opp. p. 39. Moreover, it seems that Plaintiff took no action on that basis of this notice other than applying for a visa.[3]

Further, the diversity visa lottery program is explicitly administered on the basis that more names are selected in the lottery than can receive visas. INA section 201(e), 8 U.S.C. § 1151(e), allows for 55,000 diversity visa immigrants per fiscal year; however, under the Nicaraguan Adjustment and Central American Relief Act ("NCARA"), 5,000 of the annually allocated diversity visas have been made available for use under the NCARA program beginning in Fiscal Year 1999 and continuing for as long as necessary. In recognition that some of the first

---

[3] There is no prohibition against an attempt to re-enter the DV Lottery Program in the future, although again, there will be no guarantees that a visa will ultimately issue.

50,000 aliens registered do not pursue diversity visas, the Department of State each year notifies approximately twice as many potential applicants of diversity visa eligibility than there are available numbers, to insure that as many applicants as possible can benefit from this program. Thus, the number of lottery "winners" far exceeds the number that can actually receive a visa. The letter accordingly notifies applicants that the notification does not guarantee the applicant will be able to qualify for status in time: "Selection does NOT guarantee that you will receive a visa because the number of applicants selected is greater than the number of visas available." *See* MTD Exh. A.

For example, in the DV-00 program, the Department of State notified approximately 110,000 potential DV applicants. Notifications were sent out over three months prior to the start of the fiscal year in order to give the applicants a greater chance of completing processing within the mandated one year period of eligibility. Only approximately 47,700 visa numbers were actually issued.

As for the asserted government misconduct, the allegations *(see* Opp. 39-40), even if true, do not meet the standard for estoppel. To justify estoppel, the government's action must constitute affirmative misconduct. *INS v. Miranda*, 459 U.S. 14 (1982). However, all the Plaintiff alleges is that the Defendant was unable to complete required processing before the end of the 2007 fiscal year. This conduct would not justify estoppel.

**C. This Case Does Not Warrant Equitable Relief.**

As discussed above, in Section II, *supra*, there is no relief available to Plaintiff. There have been several significant instances in which circumstances precluded otherwise eligible classes of diversity visa applicants from being issued a visa. In these cases, Congress provided

for a legislative remedy. This reflects Congress's recognition that, absent express legislative authorization, the statutory time limitations preclude any remedy that would permit an allocation of a diversity visa after the end of the fiscal year.

In one case, a State Department calculation error in the 1995 diversity immigrant visa program led to many more Polish diversity lottery entrants being notified of their eligibility for status than could be accommodated by the per country numerical limitation. Many of these entrants applied to INS for adjustment of status, and paid the required fees, without realizing that they had no realistic chance of receiving a visa number under the diversity immigrant visa program. Consequently, in section 637 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. Law No. 104-208, Div. C, Title VI-C, 110 Stat. 3009-546, 3009-704 (Sept. 30, 1996), Congress provided that eligible applicants could receive diversity status during fiscal year 1997, using pre authorized fiscal year 1997 visa numbers. However, Congress made no special provision to allocate numbers above and beyond those that would be available in FY 1997. This had the effect of increasing competition for visa numbers during the 1997 program.

In another example, in Public Law 105 360, § 1, 112 Stat. 3276 (Nov. 10, 1996), Congress provided that aliens scheduled for diversity visa interviews at the United States Embassies in Nairobi, Kenya and Dar Es Salaam, Tanzania, between August 6, 1998 and October 1, 1998, who were unable to undergo interviews because visa services were suspended as a result of the bombings of those Embassies, could be processed for a diversity visa in the next fiscal year, *i.e.*, Fiscal Year 1999. The congressional enactment also allowed for the designations of other places which may have had immigrant processing suspended as a result of

the bombings. As in the case of the Polish applicants, Congress provided that diversity visa numbers would be charged against a subsequent fiscal year's program - in this case, the Fiscal Year 1999 program - and not against the allotment for the fiscal year program through which the applicants had been selected. Congress did so even though there were leftover diversity immigrant visas for fiscal year 1998.

Another example of congressional intent regarding the diversity immigrant visa program is provided by Senate Bill 452, a private bill introduced to the Committee on the Judiciary on February 24, 1999, and reported to the Senate on August 5, 1999, which would grant immigrant status to Ms. Belinda McGregor, who had applied for a diversity immigrant visa, and adjustment of status, in 1995. Senator Hatch, in a statement supporting the bill, claimed that Ms. McGregor had been denied a diversity visa in 1995 because of a processing error by the Visa Center. Senator Hatch expressly recognized that there is no available remedy for a diversity visa applicant to adjust status after the close of the fiscal year, other than a private bill, stating: "Unfortunately, the Center does not have the legal authority to rectify its own mistake by simply granting Ms. McGregor a visa out of a subsequent year's allotment. Thus, a private relief bill is needed in order to see that Ms. McGregor gets the visa to which she was clearly entitled in 1995." *See* 145 Cong. Rec. S1926-02, S1927 (Feb. 24, 1999); *see also id*. ("The only way to provide relief is through Congressional action.").

In the State Department's view, the forgoing examples confirm that even when there are exigent circumstances attributable not to the applicant but instead to government error or actions of third parties, there is unfortunately no remedy for an otherwise qualified diversity visa applicant who could not receive a visa number during the fiscal year to obtain a diversity visa

14

after the fiscal year has ended.  The fact that in these examples Congress directed the visa numbers to come from the subsequent current fiscal year even though there were numbers remaining at the end of the fiscal years in question, demonstrates that Congress does not intend diversity visa numbers to remain available to persons who cannot receive a number by the end of the fiscal year of the particular diversity visa program, even if that unavailability is because of events beyond their control.

> The ability of the Visa Office to administer the lottery in an orderly way consistent with its understanding of congressional intent would be seriously compromised if persons who were not issued visa numbers by the end of the particular fiscal year were able to circumvent the program by obtaining court orders, despite the congressional mandate that diversity visas be allocated before the end of the fiscal year and the express notice given to every diversity visa applicant that his or her potential visa eligibility would expire at the end of the fiscal year.  In any event, in administering the program, the State Department guarantees no entrant that he or she will obtain a visa, and the only equity such an entrant can point to his or her mere notification that, through a random drawing, he or she may be eligible to obtain immigrant status.  For all the forgoing reasons no equitable relief is not warranted here, despite Plaintiff's claims.  *See* Opp. 45-47.

      **D.**    **Neither 8 U.S.C. § 1252(a)(2)(B)(i) nor Exhaustion of Remedies Defense Have been Asserted by Defendants.**

Plaintiff makes much ado about the non-applicability of 8 U.S.C. § 1252(a)(2)(B)(i) as well as the issue of administrative exhaustion.  *See* Opp. pp. 22-29.  Defendant has made no claim that 8 U.S.C. § 1252(a)(2)(B)(i) is applicable to the instant case.  That section of law pertains to aliens in the United States in removal proceedings before the Department of

Homeland Security. The Plaintiff here is not in the United States, nor in removal proceedings and the Department of Homeland Security is not a party to the case. Moreover, the opening brief is devoid of any arguments for dismissal based on any exhaustion issues. *See* MTD generally.

Plaintiff has no administrative remedy as no visa can issue under the Diversity Visa Lottery following the end of the 2007 fiscal year.

As discussed earlier regarding *Iddir v. INS*, 166 F.Supp. 2d 1250, 1259 (N.D. Ill.2001), *Nyaga v. Ashcroft*, 323 F.3d 906 (11th Cir. 2003) and *Paunescu v. INS*, 76 F.Supp. 2d 896 (N.D. Ill. 1999), even if it is determined that the Plaintiff here had an entitlement to a visa under the Diversity Visa Lottery Program, because the fiscal year of the program has ended there is no longer a legal basis for visa issuance. The statutory basis of the Diversity Visa Lottery program requires that all visas be processed within the fiscal year of that program. There is no legal authority to issue a visa after the end of that fiscal year, which ended September 30, 2007.

Plaintiff's application is therefore moot as the relief sought is unavailable because Congress has provided, in INA §204(a)(1)(I)(ii)(II), 8 U.S.C. §1154(a)(1)(I)(ii)(II), that eligibility for a diversity visa lasts only through the end of the specific fiscal year for which an alien was selected.

> The United States Constitution limits this Court's jurisdiction to live cases and controversies. A case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. Where a case is moot, it must be dismissed as non-justiciable. (citations omitted)

*Stotts v. Community Unit School District No. 1*, 230 F.3d 989, 991, *quoted in Iddir v. INS*, 166 F.Supp. 2d at 1258-59 (N.D. Ill. 2001). The Court found that the end of the fiscal year meant that plaintiffs were no longer eligible to receive visas. This fact rendered the case moot, because the INS could not issue visa numbers that did not exist. *See Zapata v. INS*, 93 F.Supp. 2d 355,

358 (S.D.N.Y. 2000) ("The plain meaning of §1154 is that after the fiscal year has ended on September 30, no diversity visas may be issued *nunc pro tunc* based on the results of the previous fiscal year's visa lottery."); *El Hindi v. Mc Elroy*, 2000 WL 1053873 (S.D.N.Y. July 31, 2000); *Sadowski v. INS*, 107 F.2d 451, 454 (S.D.N.Y. 2000) ("Where a relevant deadline for adjustment of status has passed, a request for relief is plainly moot, depriving district courts of subject matter jurisdiction.") 166 F.Supp.2d at 1259.  As no relief is available, the Plaintiff has exhausted his remedies.  Therefore the Court should disregard both of Plaintiff's arguments.

## CONCLUSION

For all the forgoing reasons Defendant's Motion to Dismiss should be granted and Plaintiff's complaint should be dismissed with prejudice.

                                                Respectfully submitted,

                                                /s/
                                        _____
                                        JEFFREY A. TAYLOR, D.C. Bar # 498610
                                        United States Attorney

                                                /s/
                                        _____
                                        RUDOLPH CONTRERAS, D.C. Bar # 434122
                                        Assistant United States Attorney

                                                /s/
                                        _____
                                        MERCEDEH MOMENI
                                        Assistant United States Attorney
                                        555 4th Street, N.W.
                                        Civil Division
                                        Washington, D.C.  20530
                                        202-305-4851

*Of Counsel*:
Gordon J. Dickey
Attorney - Adviser
Office of the Legal Adviser
United States Department of State
Washington, D.C.  20520

CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of January 2008, I caused the foregoing *Reply in Support of Motion to Dismiss* to be served on *pro se* Plaintiff, postage prepaid, addressed as follows:

**HENRI KELI**
**31 Park Grange Mount**
**Norfolk Yorkshire**
**Sheffield  S2  3SP**
**United Kingdom**

                                        /s/
                                        MERCEDEH MOMENI
                                        Assistant United States Attorney
                                        555 4th Street, NW
                                        Washington, DC 20530
                                        (202) 305-4851
                                        (202) 514-8780 (facsimile)