UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HENRI KELI, | ) |
|       Petitioner | ) |
| v. | ) Civil Action No. 07-1697 (RBW) |
| CONDOLEEZA RICE, Secretary of State, et al., | ) |
|       Respondents. | ) |

**MEMORANDUM OPINION**

Henri Keli, the petitioner in this civil lawsuit, seeks declaratory relief and a writ of mandamus to compel Condoleeza Rice, the Secretary of State, Janice Jacobs, the Assistant Secretary of State for the Bureau of Consular Affairs,[1] and Stephen A. Edson, the Deputy Assistant Secretary of State for Visa Services (the respondents in this civil lawsuit in their official capacity) to take "action on the . . . processing of a diversity visa application filed by the [petitioner]." Complaint (the "Compl.") ¶ 1. The petitioner also claims that the respondents violated the Administrative Procedures Act, 5 U.S.C. §§ 551-59, 701-06, 1305, 3105, 3344, 4301, 5335, 5372, 7521 (2000) (the "APA"), by "unlawfully withholding action on the petitioner's [diversity visa] application," Compl. ¶ 15. Finally, the petitioner seeks "reasonable attorney's fees pursuant to the Equal Access to Justice Act," 5 U.S.C. § 504(a) (2000) (the

---

[1] The petitioner's petition, filed September 20, 2007, names Maura Harty, at that time the Assistant Secretary of State for the Bureau of Consular Affairs, as a defendant in this case. The Court has substituted Assistant Secretary Jacobs as the defendant in lieu of former Assistant Secretary Harty pursuant to Federal Rule of Civil Procedure 25(d).

"EAJA"). Compl. ¶ 17. Currently before the Court is the respondents' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). After carefully considering the petitioner's complaint, the respondents' motion to dismiss, and all other memoranda and exhibits relating thereto, the Court concludes that the respondents' motion to dismiss must be granted for the reasons that follow.[2]

## I. Background

The following facts are either alleged by the petitioner in his complaint or are matters of public record. The Immigration and Nationality Act, 8 U.S.C. §§ 1101-05a, 1151-60, 1181-89, 1201-04, 1221-31, 1252-60, 1281-88, 1301-06, 1321-30, 1351-63a, 1401-09, 1421-31, 1433, 1435-55, 1457-58, 1481-83, 1488-89, 1501-04, 1521-24, 1531-37, 18 U.S.C. § 1429 (2000) (the "INA"), as amended by the Immigration and Nationality Act of 1990, 8 U.S.C. §§ 1186(b), 1288, 1254a, 1304, 1324c, 1252b, 29 U.S.C. § 2920 (2000), provides a limited number of immigrant visas each year to natives of countries that have been designated "low-admission states" by the Attorney General. This diversity visa ("DV") program utilizes a lottery system to allocate 55,000 visas per fiscal year to a pool of applicants from low-admission states. 8 U.S.C. § 1151(e) (2000).[3] However, because the diversity visa lottery selects approximately 100,000 immigrants

---

[2] In addition to the petitioner's complaint and the respondents' motion to dismiss, the Court considered the following documents in reaching this decision: (1) the respondents' Memorandum of Points and Authorities in Support of [the Respondents'] Motion to Dismiss (the "Resp'ts' Mem."), (2) the [Petitioner's] Memorandum of Law in Opposition to [the Respondents'] Motion to Dismiss [the Petitioner's] Complaint (the "Pet'r's Opp'n"), and (3) the respondents' Reply in Support of [the Respondents'] Motion to Dismiss (the "Resp'ts' Reply"). The Court also received a sur-reply from the petitioner, which is not permitted under the Court's local rules. See Local Civ. R. 7(a)-(d) (providing only for the filing of motions, memoranda of law in support of motions, oppositions to motions, and reply memoranda in support of motions). Nevertheless, the Court reviewed and considered that document in deciding the respondents' motion because the petitioner, who is representing himself pro se, may not have been aware of the restrictions imposed by Local Civil Rule 7 when he drafted his opposition.

[3] Beginning in 2000, the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100,

(continued...)

annually, "[s]election does <u>not</u> guarantee that [lottery winners] will receive a visa because the number of applicants selected is greater than the number of visas available." Compl., Ex. 1 (miscellaneous documents submitted by the petitioner) (the "Pet'r's Docs.") at 16 (emphasis added) (notification letter for selection in DV program).  Moreover, "[a]liens who qualify [through the lottery] . . . remain eligible to receive such [a] visa <u>only</u> through the end of the specific fiscal year for which they were selected."  8 U.S.C. § 1154(a)(1)(I)(ii)(II) (2000) (emphasis added).  Therefore, diversity visa eligibility expires annually on September 30, the last day of the fiscal year.  <u>See</u> 2 U.S.C. § 631 (2000) (designating October 1 as the first day of the federal government's fiscal year).  There are no exceptions to the fiscal year deadline: "Under no circumstances may a consular officer issue a visa . . . to an alien after the end of the fiscal year during which an alien possesses diversity visa eligibility."  22 C.F.R. § 42.33(a)(1) (2007).

      The petitioner, a resident of the Netherlands and a dual French and British national, was selected as a winner in the DV program lottery for fiscal year 2007.  Compl. ¶ 2; <u>id.</u>, Pet'r's Docs. at 13.  On January 10, 2007, <u>id.</u> ¶ 9, "[t]he [petitioner] properly filed an application to the [United States] Embassy of London . . . to register for a visa under the diversity visa program," <u>id.</u> ¶ 8.  The petitioner also provided various "forms and supporting documentation," including "fingerprints, police clearances and photo [identification]."  <u>Id.</u> ¶ 9; <u>see also id.</u>, Pet'r's Docs. at 8-15 (forms submitted by the petitioner along with his visa application).  At the time of his initial application, United States consular officers in London interviewed the petitioner and requested

---

<sup>3</sup>(...continued)
§ 202, 111 Stat. 2193, 2196 (the "NACARA"), designated 5,000 of the available 55,000 diversity visas for use under the NACARA program to assist immigrants from Central America seeking political asylum in the United States. Pub. L. No. 105-100, § 202, 111 Stat. 2193, 2196.  As a result, the number of available immigrant visas under the diversity visa program has effectively been reduced to 50,000 per year.

that he submit further evidence of the nature of his relationship with his wife, who applied for a visa based on her derivative status as an immediate family member. Id. The petitioner complied with this request for additional evidence "in [a] timely manner (within 5 working days)." Id.

Despite his compliance with the consulate's request, the petitioner heard nothing in reply until August 10, 2007, when consular officials invited him back to London for a follow-up interview. Id. At the conclusion of that interview, the petitioner was informed that "there [were] no reasons to deny the visa." Id. Two weeks later, however, consular officials informed him that his application still required a final security clearance from the Department of State before his visa could be granted. Id. As the September 30, 2007 deadline for approval of all diversity visa applications approached, id. ¶ 9, the petitioner attempted to contact the Department of State, the United States Embassy in London, and the Federal Bureau of Investigation several times by email but received no explanation about the delay in processing his visa application, id. ¶ 10. And at the time this complaint was filed, the petitioner's diversity visa application had yet to be processed. Id. ¶ 1.

The petitioner filed his complaint in this Court on September 20, 2007. He alleges that because he has provided the respondents with "sufficient information to determine [his] eligibility [for a diversity visa] . . . and [to] complete processing procedures," id. ¶ 12, the "[respondents'] delay in this case is, as a matter of law, arbitrary and not in accordance with the law," id. ¶ 13. Accordingly, the petitioner seeks an order "[r]equiring [the respondents] to properly adjudicate [his] application." Id. ¶ 17.

The respondents filed their motion to dismiss the petitioner's complaint on December 3, 2007. In support of their motion, the respondents argue that on September 30, 2007, the

petitioner's eligibility to receive a diversity visa expired with the end of the fiscal year. Resp'ts' Mem. at 1, 9. Respondents therefore contend that as "[t]here is no legal authority to issue a visa after the end of that fiscal year," the petitioner's claim is moot because the relief sought is unavailable. Id. at 9. Additionally, the respondents argue that even if the petitioner's claim were not moot, the Court would lack subject-matter jurisdiction over them because "under the doctrine of consular nonreviewability . . . courts have no jurisdiction to consider requests for review of consular visa decisions." Id. at 6.

In his opposition to the respondents' motion to dismiss, the petitioner counters that the respondents' mootness argument is premature, unsupported by the record, and legally erroneous. Pet'r's Opp'n at 40-45. He also disputes the respondents' assertion that the Court lacks subject-matter jurisdiction, arguing that jurisdiction is proper under the APA and 28 U.S.C. § 1331. Id. at 13-15. Finally, the petitioner introduces several entirely new grounds for his requested relief, including due process and equal protection claims and an estoppel-based theory of recovery. Id. 29-34, 39-40.

In addition to reiterating their initial mootness argument, the respondents rejoin in their reply that the case law cited by the petitioner is irrelevant because "none of the case law . . . stands for the proposition that a visa can be issued in connection with the DV [l]ottery [p]rogram after the end of the fiscal year." Resp'ts' Reply at 6-7. The respondents further submit that the petitioner's reliance on the APA is misplaced as "the APA does not apply to decisions of consular officers regarding visa issuance." Id. at 7. Moreover, they contend that the petitioner relies in error on decisions involving judicial review of the Immigration and Naturalization Service (the "INS"), which, unlike the decision at issue here, do not implicate the doctrine of

5

consular nonreviewability. Id. at 3-6. The respondents also assert that the petitioner's due process and equal protection claims have no merit because "[h]e has no claim to [c]onstitutional protections as an alien outside the United States," id. at 10, and he "has not made a colorable estoppel claim" because he can establish neither justifiable reliance on his part nor affirmative misconduct by the respondents, id. at 10-11.

## II. Standard of Review

Broadly speaking, there are two types of Rule 12(b)(1) motions. "A facial challenge attacks the factual allegations of the complaint that are contained on the face of the complaint, while a factual challenge is addressed to the underlying facts contained in the complaint." Al-Owhali v. Ashcroft, 279 F. Supp. 2d 13, 20 (D.D.C. 2003) (internal quotation and citations omitted). Where a defendant makes a facial challenge, "the [district] court must accept as true the allegations in the complaint and consider the factual allegations of the complaint in the light most favorable to the non-moving party," Erby v. United States, 424 F. Supp. 2d 180, 182 (D.D.C. 2006), just as it would on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), see Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 93 (D.C. Cir. 2002) (noting that the standard for facial challenge to subject-matter jurisdiction "is similar to that of Rule 12(b)(6)"). Where a factual challenge is made, the district court "may consider materials outside the pleadings" to determine whether it has subject-matter jurisdiction over the challenged case or claims, Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005), and "the plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence," Erby, 424 F. Supp. 2d at 182.

### III. Analysis

Based upon the arguments raised by the parties in their memoranda of law, the only issues before the Court are (1) whether the petitioner's mandamus petition is moot in light of the statutory deadline set forth in the INA (taking into account the claims raised for the first time in his opposition to the respondents' motion to dismiss), and, if not, (2) whether the Court lacks subject-matter jurisdiction over the petitioner's mandamus petition under the doctrine of consular nonreviewability.[4] Because the Court concludes that the petitioner's mandamus petition is moot and that his newly raised claims do not state a claim for which relief can be granted, the issue of subject-matter jurisdiction need not be addressed.

Article III of the Constitution confers jurisdiction to federal courts to adjudicate "Cases" or "Controversies." U.S. Const. art. III, § 2. This case or controversy requirement extends only to "actual, ongoing controversies," Honig v. Doe, 484 U.S. 305, 317 (1988), and precludes courts from deciding moot cases, Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 70 (1983). "Simply stated, a case is moot when . . . the parties lack a legally cognizable interest in the outcome," Powell v. McCormack, 395 U.S. 486, 496 (1969), or, in other words, if a court's decision "cannot affect the rights of litigants in the case," North Carolina v. Rice, 404 U.S. 244,

---

[4] The petitioner also asserts that the respondents should be estopped from arguing that his claim is moot because it was the respondents that allegedly "told [the petitioner] that [his] case[] had been approved . . . only to tell [him later] that [his] case had been denied because the [security checks were] not complete[d] in time." Pet'r's Opp'n at 39. Even if the petitioner's allegations are true and the respondents did promise him that his application would be approved, such allegations cannot support an estoppel claim because the Congressionally-mandated fiscal year deadline for awarding visas had already expired. 8 U.S.C. § 1154(a)(1)(I)(ii)(II). Thus, regardless of the assurances allegedly received by the petitioner, the remedy he seeks no longer exists and his claim is therefore moot. See In re Grand Jury Subpoenas Duces Tecum, 78 F.3d 1307, 1310 (8th Cir. 1996) ("If the case [is] moot, Article III . . . divest[s] this court of jurisdiction and any representations to the contrary by the [respondents] would not alter that outcome."). In short, the Court cannot accept the petitioner's estoppel argument because the mootness of his claim deprives the Court of jurisdiction under Article III.

246 (1971). Even in situations where a court may have had jurisdiction at the time the complaint was filed, a case nevertheless becomes moot and must be dismissed when "events outrun the controversy such that the court can grant no meaningful relief." McBryde v. Comm. to Review, 264 F.3d 52, 55 (D.C. Cir. 2001).

The petitioner requests both a mandamus and a declaratory judgment in his original petition. Compl. ¶ 1. To determine whether the Court is capable of awarding this relief, the Court must interpret the immigration law governing the DV program. See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999) (noting that analysis in any case involving statutory construction begins with the statute's plain language). The applicable language provides that aliens who are selected through the DV lottery system "shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected." 8 U.S.C. § 1154(a)(1)(I)(ii)(II) (emphasis added). The plain language of the statute makes clear that "eligibility for a [diversity visa] . . . ceases at the end of the fiscal year" and that "[u]nder no circumstances may a consular officer issue a visa or other documentation to an alien after the end of the fiscal year during which an alien possesses diversity visa eligibility." 22 C.F.R. § 42.33(a)(1). "Though unforgiving, this strict interpretation of the diversity visa statute has been adopted by every circuit court to have addressed the issue." Mogu v. Chertoff, 550 F. Supp. 2d 107, 109 (D.D.C. 2008); see also Mohamed v. Gonzales, 436 F.3d 79, 81 (2d Cir. 2006) ("we are compelled . . . to apply the unambiguous language of the operative statutory framework"); Coraggioso v. Ashcroft, 355 F.3d 730, 734 (3d Cir. 2004) (holding that the statute "unambiguously indicates Congress's intent to impose a time deadline on an applicant's eligibility"); Carrillo-Gonzalez v. INS, 353 F.3d 1077, 1079 (9th Cir. 2003) (referencing the

"[c]ongressionally-mandated, one-year deadline of the DV Lottery Program"); Nyaga v. Ashcroft, 323 F.3d 906, 914 (11th Cir. 2003) (noting that the language "eligible to receive such visa is unambiguous"); Iddir v. INS, 301 F.3d 492, 501 (7th Cir. 2002) ("[b]ased on the statutory deadline set by Congress, the INS lacks the statutory authority to award the relief sought").

The Court agrees with the respondents' argument that because the remedy sought by Keli is statutorily barred, this case is moot. The petitioner was selected to participate in the fiscal year 2007 DV program, which ended on September 30, 2007. Compl. ¶ 2; id., Pet'r's Docs. at 13. This deadline meant that as of 12:00 a.m on October 1, 2007, the petitioner was no longer eligible to receive a diversity visa. Furthermore, nothing in the statute extends the respondents' ability to issue visas through the prior year's DV program despite the petitioner's timely fulfillment of the all of the program's requirements. Simply stated, the language of the statute unequivocally bars the Court from granting the relief sought.

In an attempt to defeat the respondents' mootness argument, the petitioner argues that (1) the governing statute is ambiguous and that all ambiguities should be resolved in favor of the alien, (2) a remedy is available because he filed his complaint before the end of the 2007 fiscal year, and (3) the Court is able to retroactively order adjudication because of agency error. The Court rejects and will address each argument in turn.

A.  Statutory Construction

First, the petitioner suggests that the governing statute is ambiguous and references INS v. St. Cyr, 533 U.S. 289 (2001), for the proposition that "where there is an ambiguity in the statute, the statute must be resolved in favo[r] of the alien," Pet'r's Opp'n at 45. The petitioner's argument lacks merit because even if the Court were to reject the holdings of the five circuit

9

courts that have considered the issue and entertain the argument that the INA is ambiguous on this point, an examination of the context in which the relevant statutory text is written would still result in the conclusion that the case is moot. See Davis v. Mich. Dep't of Treas., 489 U.S. 803, 809 (1989) (holding that "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme").

     As mentioned above, the relevant portion of the statute reads as follows: "Aliens who qualify, through random selection, for a visa under section 1153(c) of this title shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected." 8 U.S.C. § 1154(a)(1)(I)(ii)(II). The only interpretation beneficial to the petitioner is one that construes the phrase "shall remain eligible to receive such visa" as actually meaning "shall remain eligible to apply for such visa." If this is the true meaning of the statutory language, receipt of a diversity visa after the end of the fiscal year may be permitted. However, Congress, in drafting the INA, used variations of the word "apply" throughout, suggesting that the later use of the word "receive" was not accidental. See, e.g., 8 U.S.C. § 1101(a)(27)(B) ("may . . . apply for reacquisition of citizenship"(emphasis added)); 8 U.S.C. § 1153(g) ("who fails to apply for an immigrant visa"(emphasis added)); 8 U.S.C. § 1156 ("or does not apply for admission"(emphasis added)); 8 U.S.C. §1157(c)(2)(B) ("parent applied for refugee status"(emphasis added)); 8 U.S.C. § 1158(a)(2)(C) ("previously applied for asylum"(emphasis added)). The petitioner's proffered interpretation would therefore run afoul of "the natural presumption that identical words used in different parts of the same act are intended to have the same meaning." Envtl. Defense v. Duke Energy Corp., ___ U.S. ___, ___, 127 S. Ct. 1423, 1432

(2007) (internal quotation and citation omitted).

Indeed, the Eleventh Circuit considered and dispensed with this exact argument in Nyaga, concluding that the phrase "eligible to receive such visa" in § 1154(a)(1)(I)(ii)(II) "plainly means that aliens . . . who have been randomly selected to qualify for a visa under the diversity visa program cannot be issued a visa after midnight of the final day of the fiscal year for which they were selected." Nyaga, 323 F.3d at 914.  In that case, Nyaga, a resident alien, qualified for a diversity visa through the 1998 selection process.  Id. at 909.  Nyaga timely submitted his application, but the INS did not adjudicate it before end of the fiscal year.  Id.  Three years later, in 2001, Nyaga sought an order to compel the INS to adjudicate his DV application.  Id. at 910.  The United States District Court for the Northern District of Georgia  "concluded that the INS has a clear, non-discretionary duty to process Nyaga's application," and ordered the adjudication of Nyaga's application as though the fiscal year had not ended.  Id. at 911.  On appeal, the Eleventh Circuit reversed the district court's decision, concluding that "even if the INS has a non-discretionary duty to process Nyaga's adjustment application, Nyaga's case was moot because as of midnight on September 30, 1998, he was no longer eligible to receive a diversity immigrant visa." Id. at 907.

In addition to analogizing § 1154's plain language, the Eleventh Circuit reviewed prior legislative enactments from Congress relating to the DV program, and concluded that this history supported its textual interpretation.  Id. at 915 n.8.  Specifically,

> in 1996 Congress passed legislation which permitted Fiscal Year 1995 Diversity Program applicants from Poland to receive diversity visas from the fiscal year 1997 visa numbers.  In 1998, Congress enacted ameliorative legislation that authorized Fiscal Year 1998 Diversity Visa Program applicants from Kenya and Tanzania . . . to

> receive visas from the fiscal year 1999 visa numbers. While neither situation involved . . . [a] failure to process a lottery winner's application, this distinction is irrelevant; <u>Congress's action clearly evince[d] its understanding that an applicant is no longer eligible to receive a visa, absent legislative action, after the relevant fiscal year has ended</u> even if there are unissued visa numbers remaining from the relevant fiscal year.

<u>Id.</u> (emphasis added) (internal citations omitted).

Thus, even if the Court were to assume that the language of the statute is ambiguous, which it is not, the legislative history clearly indicates that Congress intended to limit the scope of a diversity visa applicant's eligibility for such a visa to the end of the applicable fiscal year. Here, the petitioner seeks adjudication of his DV application after the end of the fiscal year in which he was eligible to receive a visa, rendering his claim moot under the terms of § 1154. The petitioner's arguments to the contrary must therefore be rejected under the plain language of the statute and in accordance with related legislative acts of Congress regarding the DV program.

B.   <u>Timing of the Filing of the Complaint</u>

The petitioner's second major argument is that relief is available because this "action was filed prior to September 30, 2007," the end of the applicable fiscal year. Pet'r's Opp'n at 42. There is authority that at least to some degree supports this proposition, but there is also authority that clearly rejects it. In <u>Paunescu v. INS</u>, 76 F. Supp. 2d 896 (N.D. Ill. 1999), the district court reviewed a diversity visa case similar to the one here and issued a preliminary injunction requiring adjudication of a DV application before the end of the applicable fiscal year. <u>Id.</u> at 898. On the other hand, the court in <u>Zapata v. INS</u>, 93 F. Supp. 2d 355 (S.D.N.Y. 2000), denied a petitioner's request for similar relief where the court had not granted a preliminary injunction prior to the end of the fiscal year in which the petitioner was a DV program applicant, <u>id.</u> at 357-

358.

In Paunescu, the plaintiff was selected as a winner for the Fiscal Year 1998 DV program. Paunescu, 76 F. Supp. 2d at 898. As in so many other cases, Panuescu submitted his paperwork on time and was told to wait for the INS to adjudicate his application. Id. After complying with three separate requests to supply his fingerprints, Paunescu filed an action in the United States District Court for the Northern District of Illinois on September 23, 1998, before the end of the fiscal year for which he was eligible to receive a diversity visa, seeking preliminary injunctive relief. Id. On September 25, 1998, the court ordered the defendants to "immediately complete adjudication of the applications for adjustment status . . . without delay and by no later than September 30, 1998." Id (internal quotations and citations omitted). September 30, 1998 came and went, and while the defendants "demonstrated that they made some efforts to comply with t[he] court's . . . order, the evidence demonstrate[d] that none of the responsible parties coordinated their efforts to ensure that th[e] court's order could be implemented." Id. at 902. The court held that because the defendants violated its order entered before the end of the 1998 fiscal year, the applications had to be adjudicated and the "[p]laintiffs should not be penalized for the government's misfeasance." Id.

Zapata involved strikingly similar facts to those in Paunescu, but the court reached a very different conclusion. One of the plaintiffs in that case, Limber Zapata,[5] was selected for the Fiscal Year 1998 DV program, submitted all the necessary paperwork to the proper authorities, and attended an INS interview. Zapata, 93 F. Supp. 2d at 357. The application was complete

---

[5] Limber Zapata's wife, Margarita Zapata, was a co-plaintiff in the suit. Zapata, 93 F. Supp. 2d at 356. Her application for a visa, like that of the petitioner's wife in this case, was wholly derivative of her husband's application. Id. at 357.

and the INS was waiting for Zapata's fingerprints to clear as of March 30, 1998, a full six months before the end of the fiscal year. Id. Having not heard anything from the INS, the Zapatas filed an action in the United States District Court for the Southern District of New York seeking an injunction "requiring the INS (1) to rule upon their application for an adjustment of status before September 30, 1998[,] and (2) to reserve for them two of the 55,000 diversity visas allocated for 1998." Id. The district court did not take any action until August 23, 1999, when it requested that the parties file additional memoranda of law addressing whether the case had since become moot. Id. On January 3, 2000, the court held that "[b]ecause September 30, 1998 has passed, the INS can not now be required to rule . . . on the Zapatas' application for adjustment of status." Id. at 358.

The Zapata court did not distinguish Paunescu in rendering its ruling. See id. at 358 (concluding that the plaintiffs' claims were moot based solely on the plain language of the statute). Nevertheless, the facts in that case differed from those in Paunescu in one important respect: unlike what occurred in that case, the court in Zapata did not order any injunctive relief before the applicable fiscal year ended. Compare Zapata, 93 F. Supp. 2d at 355 (no prior injunctive order issued), with Paunescu, 76 F. Supp. 2d at 896 (prior injunctive order issued). Both the Third and Seventh Circuits have hinted that the entry of injunctive relief prior to the end of the applicable fiscal year may preserve a case's justiciability. See Coraggioso, 355 F.3d at 734 n.8 ("[h]ad Coraggioso sought relief prior to the expiration of the 1998 fiscal year, our analysis may have been different"); Ahmed v. Dep't of Homeland Sec., 328 F.3d 383, 387 (7th Cir. 2003) (noting that "[b]oth the majority and the concurring opinion [in Iddir] recognized that the case would have been different if it had been filed before the end of the visa year . . . and if the district

court had acted within that time period"); Iddir, 301 F.3d at 501 n.2 (opining that "[i]t would be a different case had the district court ordered the INS to adjudicate the appellants' status while the INS maintained the statutory authority to issue the visas"). It is therefore conceivable that a district court could maintain jurisdiction and reject a mootness challenge if it took some affirmative action to compel adjudication of a DV application within the fiscal year during which the aggrieved applicant was eligible.

Unfortunately for the petitioner, he did not seek, and the Court did not grant, a temporary restraining order, preliminary injunction, or any other relief in this case prior to the expiration of the fiscal year in which he was eligible for a diversity visa. An earlier application for judicial intervention on the petitioner's part might not have proved successful, but in any event the petitioner did not file his mandamus petition until September 20, 2007–a mere ten days before the end of the fiscal year–hardly giving the Court adequate time to intervene before the fiscal year expired. Under these circumstances, there is simply no basis in reason or precedent to accept the petitioner's argument that his claim is still justiciable because he filed his complaint before the end of the applicable fiscal year. The Court must therefore reject it.

C.  Equitable Relief

Finally, the petitioner argues that because the respondents failed to fully adjudicate his application, a remedy is available and equitable relief is warranted. By analogizing his circumstances to the facts in Perales v. Thornburgh, 967 F.2d 798 (2d Cir. 1992), the petitioner argues that his claims "have no more become moot with the end of the fiscal year 2007 than legal challenges to administration of amnesty under the Immigration Reform and Control Act of 1986 [8 U.S.C. §§ 1160, 1187-88, 1255a, 1324a-b, 1364-65 (2000) (the "IRCA")] were mooted out by

the end of [that program]." Pet'r's Opp'n at 41. Additionally, the petitioner cites Silva v. Bell, 605 F.2d 978 (7th Cir. 1979), for the proposition that "illegal agency action" warrants equitable relief. Pet'r's Opp'n at 43. However, Perales and Silva are distinguishable from this case in that while equitable relief may be warranted, the Court is nevertheless powerless to grant the requested remedy.

In Perales, the Second Circuit held that Congress intended to implement the IRCA "'in a liberal and generous fashion'" because it was a "'one-time-only program,'" Perales, 967 F.2d at 813 (quoting H.R. Rep. No. 99-682(I), reprinted in 1986 U.S.C.C.A.N. 5649, 5676), vacated in part sub nom. Reno v. Perales, 509 U.S. 917 (1993), and it was therefore essential that aliens be afforded a "'fully effective twelve[-]month[]'" time frame to apply for amnesty, id. at 814. Due to errors by the defendants in implementing the amnesty program, which deterred individuals like the plaintiffs from seeking relief provided by the statute, the Perales court found that the plaintiffs had not been provided the full twelve-month application period afforded them by the controlling statute. Id. at 813-14. It therefore concluded that equitable relief in the form of an extension of the filing deadline was warranted. Id.

In Silva, the INS undercounted the number of visas available to diversity visa applicants from the Western Hemisphere by subtracting visas awarded to Cuban refugees, who were excluded from the diversity visa quota imposed on other Western Hemisphere applicants, from the pool of visas available to those other applicants. Silva, 605 F.2d at 980-81. This mistake effectively excluded those applicants from the Western Hemisphere who would have received their visas had the visas awarded to Cuban refugees not been deducted from the pool of available visas. Id. at 981. The Seventh Circuit determined that the INS's error warranted, inter alia, the

recapture and reissuance of visas to those improperly excluded applicants. Id. at 988-89.

      Notably, although Perales did involve a deadline concerning the submission of an application for amnesty, the governing statute did not bar receipt of the requested remedy as it does here. Specifically, the statute at issue in Perales–8 U.S.C. § 1255a–provides that "during a twelve-month period beginning 'on a date . . . designated by the Attorney General' and later established by regulation as May 5, 1987 through May 4, 1988, illegal aliens could apply to the INS for temporary resident status." Perales, 967 F.2d at 801 (quoting 8 U.S.C. § 1255a(a)(1)(A) (2000)). Conversely, the statute at issue here provides that "[a]liens who qualify, through random selection, for a visa under section 1153(c) of this title shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected." 8 U.S.C. § 1154(a)(1)(I)(ii)(II) (emphasis added). While nothing in the statute at issue in Perales precluded granting the relief requested by the plaintiffs, the statute at issue here does precisely that in its express language regarding receipt of diversity visas.

      Similarly, there is nothing to suggest that an agency or even a court addressing facts like those in Silva is statutorily barred from redistributing visa numbers to achieve the purpose of the statute in the same way a court is barred from providing the relief requested under the circumstances here. In fact, the parties and the Seventh Circuit in Silva agreed that in the absence of contrary statutory authority, "a program to recapture and reissue the wrongfully issued visa numbers[] [was] appropriate" to correct an error on the part of the government. Silva, 605 F.2d at 985. Accordingly, the cases cited by the petitioner are inapposite, and the court is left with the plain language of the DV statute, which uncategorically renders this case moot.

### IV. Conclusion

The Court is not blind to the plight of the petitioner and his wife, who seek only the opportunity to embark on the same journey that millions of others from around the world have taken to the great benefit of this Nation. By all accounts, Mr. And Mrs. Keli have done everything asked of them by the State Department, and have done nothing to forestall the processing of their diversity visa applications. Doubtless, they feel, as the plaintiffs did in Paunescu, that they have become "the victims of a bureaucratic nightmare." Paunescu, 76 F. Supp. 2d at 902. Nevertheless, even the most egregious of circumstances do not permit this Court to opine on the merits of claims for which no remedy is available. Where, as here, "events [have] outrun the controversy such that the [C]ourt can grant no meaningful relief, the case must be dismissed as moot." McBryde, 264 F.3d at 55. Accordingly, the Court must grant the respondents' motion to dismiss.

**SO ORDERED** this 18th day of August, 2008.[6]

> REGGIE B. WALTON
> United States District Judge

---

[6] An order follows granting the respondents' motion, dismissing the petitioner's complaint as moot, and closing this case.